394 So.2d 584 (1981)
STATE of Louisiana
v.
Edward BODLEY.
No. 80-KA-1440.
Supreme Court of Louisiana.
January 26, 1981.
Rehearing Denied March 2, 1981.
*586 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Sheila Myers, Louise S.
*587 Korns, Asst. Dist. Attys., for plaintiff-appellee.
Alan P. Dussouy, New Orleans, for defendant-appellant.
BLANCHE, Justice.
Defendant, Edward Bodley, was indicted in connection with the first degree murder of Louise Williams. Bodley's first trial ended in a mistrial during the prosecution's opening statement to the jury. A second trial ended in a jury deadlock, and a mistrial was again granted. At the conclusion of the third trial, defendant was found guilty as charged. He was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. Defendant lodged this appeal, urging eight arguments as grounds for reversal of his conviction and sentence.
On the morning of Monday, July 11, 1977, John Richardson drove to the North Tonti Street residence of his mother-in-law (by common law relationship), Ms. Louise Williams, for the purpose of giving defendant, Edward Bodley, a ride to work. Bodley had been living with Ms. Williams, his aunt, since his arrival in New Orleans some few weeks previous and had been hired by Richardson as a laborer at the CFW Construction Company. On this particular morning, Richardson's knocks went unanswered, so he assumed that Bodley must have been driven to work by James Pitts, another CFW employee and a boarder in the Williams' house.
Upon arriving at work, Richardson questioned Pitts as to Bodley's whereabouts, only to discover that Pitts had seen neither Ms. Williams nor Bodley upon his return from Birmingham the previous evening. During the course of the conversation, Richardson recalled the inability of Dorothy Barnes, his common law wife, to reach her mother by phone on the previous day. Becoming worried, Richardson returned to the residence with Mr. Pitts. Pitts unlocked the back door to the residence and the two men then walked through Pitts' bedroom and the common kitchen to a door which separated Ms. Williams' bedroom and living room from the rest of the house. Richardson peered through a window in this door and observed a large bundle of bedspreads lying on the floor. Richardson then pulled on the door, breaking the latch lock which kept it closed. Entering the front bedroom, Richardson nudged the bundle with his foot and realized that it contained a body. Both he and Pitts immediately exited the house and asked a neighbor to call the police.
When New Orleans City Police Officer Earl Augustine arrived at the Williams residence, Mr. Pitts opened the front door and allowed the officer to enter. Augustine immediately recognized the odor of decaying flesh and notified both the coroner's office and the Homicide Division. Thereafter, investigating officers unwrapped Ms. Williams' nude body, revealing a single stab wound to the left side of her chest. They also discovered that Ms. Williams' legs had been amputated at the knee joints and placed in a plastic garbage bag found in the victim's bedroom. During their investigation, officers recovered items believed potentially relevant to the solution of the crime.
The defendant never returned either to the residence or to work, thereby abandoning personal possessions and a paycheck. He was eventually arrested by a U. S. Customs Official while attempting to enter Laredo, Texas from Mexico on November 22, 1977. Extradition, trial and conviction followed.

Assignment of Error Number 1
Defendant contends that the trial court erred in refusing to suppress the introduction into evidence of a pair of damp blue jeans seized from a clothes hamper located in the bathroom and a knife seized from near the kitchen sink of the victim's apartment. He claims that this warrantless seizure of evidence was per se unreasonable in violation of art. 1, § 5 of the Louisiana Constitution. Alternatively, he claims that under no recognized exception to the warrant requirement could the seizure of the blue jeans be justified.
*588 It is well settled that a warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and United States Constitutions. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Dowling, 387 So.2d 1165 (La.1980); State v. Wilkerson, 367 So.2d 319 (La.1979); State v. Wagster, 361 So.2d 849 (La.1978); State v. Mitchell, 360 So.2d 189 (La.1978). Consent is valid when it is freely and voluntarily given by a person who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). This common authority stems not so much from one's property interest, "... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Matlock, supra, 94 S.Ct. at 993, fn. 7.
In the present case, James Pitts had rented the rear bedroom of the Williams home for a period of several months. Under the terms of the arrangement, Pitts shared the kitchen and the bathroom while the rest of the house (consisting of a living room and a bedroom) remained "locked off" for Ms. Williams' exclusive use. Thus, he had mutual access and control over the areas from which the evidence was seized. Further, the positions of the knife and clothes basket in plain view within the common areas indicates that the residents had assumed the risk that one of their members might permit the common area to be searched.
The record also indicates that consent for the police to search and seize the evidence was impliedly granted by Mr. Pitts and Mr. Richardson. After discovering Ms. Williams' body, the pair ran out of the house and requested a neighbor to call the police for assistance. When the first officer arrived at the scene, Mr. Pitts, after entering from the rear, opened the front door of the apartment and allowed the officer to enter. It is readily apparent that Pitts and Richardson requested the presence of the police at the apartment and wanted them to investigate the suspected homicide. State v. Dowling, supra. Thus, there was both consent to allow the search and authority over the areas from which the objects were obtained.
Assignments of Error Numbers 2, 7 and 8
By these assignments, defendant contends that the trial court erred in allowing testimony as to various telephone conversations in which he allegedly participated when no foundation for such testimony had been laid and where the state had failed to provide notice of its intent to use said conversations at trial.
The first witness called to the stand by the state was Dr. Monroe Samuels, the Chief Consultant Pathologist for the Orleans Parish Coroner's Office. Dr. Samuels testified that he had performed an autopsy on Louise Williams' body at 9:00 a. m. on July 11, 1977, approximately one hour after discovery of the body by New Orleans Police officers. This examination revealed that the cause of death was a stab wound in the lower left chest which had pierced both the pulmonary artery and the aorta. Dr. Samuels further testified that Ms. Williams had been dead at least 24 hours (and perhaps 48 hours) prior to his examination.
In order to demonstrate defendant's presence in the Williams' house after the victim's murder, the state called several witnesses to testify as to alleged telephone conversations with the accused. John Richardson testified that defendant had called his house at about eight o'clock on Sunday, July 10th. After informing Richardson that "they" would be coming over for dinner, defendant asked to speak to Dorothy Barnes.
When Ms. Barnes got on the phone, defendant inquired as to her plans for the *589 day. Ms. Barnes told defendant that she was going to church and asked him where her mother was. When the accused responded that she was sleeping, Ms. Barnes agreed to call back later. Ms. Barnes then testified that she called her mother a second time between 10:00 and 10:30 that morning. According to Ms. Barnes, defendant answered the phone and told her that Ms. Williams had gone to the laundromat.
Coupling Dr. Samuels' opinion as to the time of Ms. Williams' death with other testimony that the only phone in the Williams residence was located in the room in which the decedent was found, it becomes apparent that defendant Bodley was standing over the deceased's corpse at the time Ms. Barnes called the Williams' residence. Under these circumstances, the further attempt to mislead Ms. Barnes as to the whereabouts of her mother was at least circumstantially suggestive of the accused's guilt.
Later during trial, Lorraine Candice, Ms. Williams' mother and Bodley's grandmother, testified that the defendant had called his mother's house in Mobile, Alabama at about 10:00 a. m. on July 11ththe same day that Ms. Williams' body was discovered. In response to Ms. Candice's inquiry, defendant stated that Ms. Williams was doing fine and that she had gone to work that morning. Again this conversation suggested an active attempt to conceal the fact of Ms. Williams' death while the accused made good his escape.
By this appeal, defendant argues that testimony as to these telephone conversations was not admissible unless the state had sufficiently demonstrated each witness' familiarity with defendant's voice. With respect to Ms. Barnes, such a predicate was laid. Ms. Barnes, in response to the prosecutor's questioning, indicated that she spoke with defendant almost every day, sometimes by telephone, and that she did not have any difficulties recognizing his voice. With respect to John Richardson and Lorraine Candice, the defense failed to object at trial to the lack of testimony concerning voice recognition. A claim of such an irregularity cannot be availed of after verdict unless it is objected to at the time of its occurrence and the specific ground is stated. C.Cr.P. art. 841; State v. Davis, 357 So.2d 1125 (La.1978); State v. O'Blanc, 346 So.2d 686 (La.1977).
By this assignment, defendant also reurges his contention that testimony regarding the accused's telephone conversations with Barnes, Richardson and Candice was rendered inadmissible by the state's failure to provide the defense with written notice of its intent to use said conversations. C.Cr.P. art. 768. This contention is grounded in the mistaken assumption that defendant's statements, since damaging at trial, are necessarily inculpatory in character. Such is not the case. As used in art. 768, the term "inculpatory statement" refers to an out-of-court admission of incriminating facts made by the defendant after the crime has been committed. State v. Berain, 360 So.2d 822 (La.1978); State v. Labostrie, 358 So.2d 1243 (La.1978); State v. Brent, 347 So.2d 1112 (La.1977). An incriminating statement is one which admits a fact tending to establish guilt, or from which guilt may be inferred. State v. Rogers, 375 So.2d 1304 (La.1979); State v. Brumfield, 329 So.2d 181 (La.1976).
In the present case, the accused's telephone statements concerned the whereabouts of the victim. Defendant made no statements of fact which establish any element of the crime of murder of their own force. Rather, the statements were exculpatory in nature. State v. Rogers, supra. They were not damaging to the defense until coupled with Dr. Samuels' opinion that the victim was already dead at the time the alleged statements were made. Under these circumstances, the defendant's sole avenue of discovery was provided by C.Cr.P. art. 716(B)[1], which provides as follows:

*590 "B. Upon motion of the defendant, the Court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at trial, with the information as to when, where and to whom such oral confession or statement was made."
Here the defense did file a motion for bill of particulars which incorporated an art. 716 request for statements by the accused. In answering this motion, the state advised the defense, in open court, that it intended to introduce one or more telephone conversations, occurring one or two days prior to the discovery of the victim in this case, and which were allegedly participated in by the defendant. The state refused to disclose the names of persons to whom the defendant's remarks were addressed, but did provide the defense with a list of witnesses which the prosecution intended to call at trial.
Though the state undoubtedly erred in failing to disclose the identity of these individuals, the defense has made no allegation as to how this nondisclosure may have prejudiced its case. In State v. Bonanno, 373 So.2d 1284 (La.1979), this Court found that the failure to give an art. 716 notice should be analyzed for prejudice where, as here, the prosecution has given notice of its intent to use telephone conversations of the accused within a day or two of the offense and, in addition, supplies the defense with a list of its witnesses, it is reasonable to assume that the defense was fully apprised as to the parties involved in these conversations. In fact, at the hearing on defendant's motion to suppress, Mr. Richardson referred to a phone call which he received on July 10ththe day of Ms. Williams' murder. Inquiry into the content of this call was halted by defense objection. Further, prior to the declaration of mistrial at the first trial of this matter, the state mentioned in its opening statement that it intended to call Ms. Barnes to testify to telephone conversations she had with the defendant at the time when Ms. Williams was dead.
This assignment lacks merit.
Assignments of Error Numbers 3 and 10
By these assignments, defendant argues that the trial court erred in admitting photographs of Ms. Williams' dismembered body and in allowing testimony of Dr. Samuels as to the post-mortem amputation of the victim's legs.
In State v. Vernon, 385 So.2d 200, 204 (La.1980), this Court stated:
"The test of admissibility of allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury. State v. Matthews, 354 So.2d 552 (La.1978). Photographs which illustrate any fact or which shed light on an issue, or are relevant to describe the person, place or thing involved are generally admissible. State v. Valentine, 364 So.2d 595 (La.1978). Photographs of a deceased victim may be relevant to prove the corpus delicti, to corroborate other evidence of the manner in which the death occurred, to establish the location, number and severity of the wounds and to establish the victim's identity. State v. Williams, 343 So.2d 1026 (La.1977); State v. Myles [389 So.2d 12 (La.1980)]."
See also State v. Landry, 388 So.2d 699 (La.1980).
In the instant case, the state introduced two large black and white photographs, one depicting the victim's bloody, swollen body lying on her bedroom floor atop a bedspread and another showing the deceased's legs partially wrapped in a plastic garbage bag. The defendant argues not only that these photographs unnecessarily inflamed the jury's sensibilities, but also *591 that they were irrelevant in view of his willingness to stipulate as to the identity of the victim and "anything further concerning these photographs." While the existence of an offered stipulation necessarily bears upon a balancing of the probative value of the photographs against their prejudicial effect, the decision nevertheless remains one for the trial court. State v. Landry, supra; State v. Sterling, 377 So.2d 58 (La.1979).
The probative value of the pictures and testimony greatly outweighs the possible prejudice to the jury. Since the identity of the murderer was the key issue of the case in which there were no apparent witnesses, any evidence which would significantly narrow the field of suspects would be considered highly relevant. The testimony of Dr. Samuels was that the victim's legs had been severed by incise wounds without bruising or tearing of the cartilage surrounding the knee. The photographs were corroborative of this testimony. When coupled with the testimony of Mr. Benny Justice concerning defendant's experience as a butcher, the photographs and related testimony were strongly suggestive of the accused's guilt. Furthermore, the depiction of the victim's decomposed state corroborated Dr. Samuels' testimony as to the time of death of the victim.
This assignment is without merit.
Assignments of Error Numbers 4 and 5
By these assignments, defendant challenges the denial of a motion to quash based upon double jeopardy grounds. The motion had been filed after the first trial of this matter ended in mistrial.
Prior to the first trial of this matter, the state requested notice of alibi. C.Cr.P. art. 727. The trial judge granted a defense request for a list of state witnesses in order that the defense might ascertain whether or not alibi testimony would be presented as part of the accused's case. The request was granted because the state was unable to state, with any degree of certainty, the time at which the offense was alleged to have occurred.
After the prosecutor had given defense counsel the list, she decided to use Mr. Benny Justice, a butcher and former employer of defendant, as a witness. In order to establish a link between the dismemberment of the victim and defendant, the prosecutor intended to have Mr. Justice testify that he taught defendant how to butcher cattle at his slaughterhouse and that defendant was skilled at the art of butchering.
The prosecutor filed an amended witness list containing Mr. Justice's name with the court, but she failed to provide the defendant with the information. Thus, the defense first became aware that Mr. Justice would be a witness for the state during the prosecutor's opening statement. Defense counsel objected immediately.
Outside the presence of the jury, the trial judge indicated his inclination to grant a mistrial should the defense request one. The defense attorney indicated that, contrary to his advice to the defendant, the defendant had requested counsel not to seek a mistrial and, therefore, he did not feel that he could move for a mistrial. The judge then asked the defendant himself if he would object should the court declare one. The defendant indicated that he was opposed to the granting of a mistrial. At that point, the judge decided to grant a recess to allow defense counsel time to produce witnesses to rebut the testimony of Mr. Justice. Defense counsel then requested leave to withdraw as counsel. Upon hearing the request, the trial judge then changed his mind and granted a mistrial sua sponte. The court, at defendant's request, however, allowed defense counsel to continue to represent defendant. The same counsel then filed the motion to quash, which became the basis of these assignments.
Although C.Cr.P. art. 592 provides that "when a defendant pleads not guilty, jeopardy begins when the first witness is sworn at the trial on the merits", the U.S. Supreme Court has clearly stated that as a matter of Constitutional law jeopardy attaches *592 in a jury trial when the jury is impaneled and sworn. Crist v. Bretz, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). Thus, by the time the prosecution began its opening statement at the first trial, jeopardy had attached. Once jeopardy has attached, C.Cr.P. art. 591 governs the circumstances under which a subsequent trial for the same offense is permissible. The article states:
"No person shall be twice put in jeopardy of life or liberty for the same offense, except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with the express consent of the defendant."
Code of Criminal Procedure art. 775 states:
"A mistrial may be ordered, and in a jury case the jury dismissed when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;
(5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial.
"Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
"A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial."
The defendant contends that the trial judge granted a mistrial that was not authorized by art. 775 and, therefore, that art. 591 prevents a retrial for the same offense. State v. Coffil, 377 So.2d 106 (La.1979). We disagree.
Before a person may be validly convicted and punished by imprisonment, he must be accorded the right to the assistance of counsel. The purpose of this right is to insure that a defendant embroiled in our accusatory system of justice, probably untrained in law, can utilize every advantage which the law grants him. The intercession of an independent person trained in law in behalf of the accused serves to require the state to meet every procedural and substantive hurdle before a conviction can be obtained. His job is to cross examine the prosecution's witnesses so that the defendant receives the benefit of any inconsistencies or gaps in their testimony. Counsel is further charged, when possible, with going forward with whatever exculpatory evidence the defendant might be aware of or any other defense recognized by the law. All of this is best done by one with knowledge of what legal significance attaches to what witnesses state or fail to state.
Equally important is the general ability of defense counsel to make informed tactical choices between alternative courses of action. Sometimes it is better to forego immediate advantage in the hope of greater reward later. It may be better for the defendant to stand upon the weakness of the prosecution's case, for example, than to go forward with a defense witness that has a good story but very serious credibility problems.[2] The same considerations are present when the defense must decide whether to seek a mistrial or not. The advantage to the defendant is that the state is forced to go to the trouble of gearing up for a new trial while the defendant sits back and prepares to meet the evidence which he then knows a great deal about. In the meantime, the prosecution's witnesses might forget their testimony, die or be otherwise unavailable. The state may even *593 reassess it chances of successfully prosecuting the defendant in light of the evidence and economic and manpower considerations. The disadvantage is that the defendant may have to live for extra months with the threat of a pending prosecution.
While an indigent defendant has a right to counsel as well as the opposite right to represent himself, he has no constitutional right to be both represented and representative. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); United States v. Daniels, 572 F.2d 535 (5th Cir. 1978); United States v. Conder, 423 F.2d 904 (6th Cir. 1970), U.S. cert. den. 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267; United States v. O'Looney, 544 F.2d 385 (9th Cir. 1976), U.S. cert. den. 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625. With regard to trial tactics, the federal courts have clearly stated that once a person is represented by counsel, he is bound by his attorney's decisions at trial unless the attorney's actions effectively deny the defendant his Sixth Amendment right to assistance of counsel. United States v. Daniels, supra; see also Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). While this rule is an interpretation of a federal statute, it sets up the constitutional boundaries of a trial court's discretion. Using the rule, federal courts have stated that a defendant has no right to enter his own personal objections to testimony after he has accepted the pre-trial assistance of counsel, Conder, supra; no fundamental right to require that a particular witness be called at trial, Daniels, supra; nor a right to object to his attorney's decision to request a special verdict in a criminal case, O'Looney, supra. In United States v. Conder, supra, at 908, it was stated:
"While it may be within the discretion of a District Court to permit both a criminal defendant and his attorney to conduct different phases of the defense in a criminal trial, see United States v. Burkeen, supra, [355 F.2d 241] for purposes of determining whether there has been a deprivation of constitutional rights a criminal defendant cannot logically waive or assert both rights. The defendant must make a choice, and he should not be permitted to manipulate his choice so that he can claim reversible error on appeal no matter which alternative he chose in the District Court. See United States v. Plattner, supra, 330 F.2d [271] at 276."
In the absence of a state statute or constitutional provision to the contrary, we hold that the same principles are applicable in the present case.
The record indicates that the state failed to comply with a court order by not revealing Mr. Justice's name to the defendant. The testimony to be given by the witness was highly prejudicial to the defense because it tended to narrow the class of persons who could have committed the crime to one of which defendant was a member. Through this witness, the state was prepared to attempt to show that only a person with the expertise possessed by the defendant could have dismembered the victim's legs in such a fashion. Counsel objected and complained that he relied on the witness list furnished to it by the state, was surprised by this testimony, and was not prepared to meet such prejudicial evidence on such short notice. For that reason, defense counsel declined to go forward with the case on the ground that to do so would be in violation of his professional duty to his client.
We regard the refusal of counsel to go forward with the case as a reasonable course of action, when the drastic consequences of such testimony are considered, and do not understand why counsel should be bound by his client's wishes to proceed to trial under such adverse conditions and contrary to his best professional advice. Thus, we completely disregard counsel's deference to his client's wishes in a matter which the client was not competent to decide and which was contrary to his professional judgment and advice. We likewise regard counsel's insistence and refusal to proceed with the trial and to be relieved as counsel if the trial judge did proceed over his objection as constituting trial conduct which we regard as an application to the court for a mistrial.
*594 It cannot be denied that counsel's conduct successfully obtained a continuance of the trial after jeopardy attached to the defendant's advantage. Counsel was able to interview all of the out-of-state witnesses who were present in court, was given time to prepare for Mr. Justice's testimony, and given the further right to continue as defendant's counsel. As noted by the trial judge, counsel was not entitled to the best of both worlds, i. e., to rely on trial and error on the one hand if the trial proceeded and escape judgment on a technical objection that jeopardy attached because of his client's objection to delay the trial although not in his best interest.
We find that the defendant, through counsel, requested the mistrial, which was properly granted.[3] Thus, C.Cr.P. art. 591 did not bar retrial. This assignment is without merit.

Assignment of Error Number 5
By this assignment defendant urges that it was error for the trial court to deny his pre-trial motion to quash based upon the denial of a speedy trial.
The right to a speedy trial is guaranteed by both the federal and state constitutions. State v. Nowell, 363 So.2d 523 (La.1978). This right attaches when an individual becomes an accused, either by formal indictment or bill of information or by arrest and actual restraint. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); State v. Fraise, 350 So.2d 154 (La.1977); State v. Nowell, supra. This Court has adopted the test of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the United States Supreme Court weighed the conduct of both the prosecutor and the defendant in light of four factors: length of delay, reasons for delay, assertion of the right, and prejudice to the defendant. State v. Nowell, supra; State v. Kemp, 359 So.2d 978 (La.1978); State v. Bullock, 311 So.2d 242 (La.1975).
The record indicates that the defendant was indicted on August 2, 1977. Defendant was not captured until November 22, 1977 but was not extradited and returned to New Orleans until February 22, 1978. Counsel was appointed to represent defendant on March 15. Arraignment took place on the 30th of that month. On April 11, the defense filed several preliminary proceedings. The trial court ruled on the sufficiency of the state's answers on April 21, 1978, and also appointed a defense requested Lunacy Commission. On May 23, 1978, defendant was held to be presently sane.
The defense initiated a second round of discovery requests on June 15, 1978, when it filed motions to suppress and motions for production of tangible items. The state filed answers to the defense requests, and the skirmish ended August 4 when the trial court ruled on the motions.
Apparently the trial of the matter was set for November 20, 1978, for on that date the prosecution filed a motion to continue the trial. The trial was continued until December 14, when the prosecution filed another motion to continue the trial. The motion was granted over defense objection and the trial continued until January 18, 1979. On that date, trial was begun but ended in a mistrial. The defendant then filed in March two motions to quash, one alleging the denial of a speedy trial. On March 15, the second trial ended in a deadlocked jury and a mistrial was granted on motion of the defense. On April 9, 1979, counsel of record from arraignment to date requested to withdraw from the case and leave was granted. On May 30-31, 1979, the instant trial took place, resulting in defendant's conviction.
From the foregoing, it is readily apparent that most of the 18 month delay between arrest and the third trial was *595 caused by defense motions. The amount of delay attributable to the prosecution was only two months, which is reasonable considering the prosecution's necessity to have witnesses come from out of state to testify. Further, defendant did not complain of the delay until one month prior to the first trial. Finally, the defendant can demonstrate no prejudice which occurred as a result of the alleged denial of speedy trial other than a generalized complaint of inability to prepare a defense.

Assignments of Error Numbers 6 and 9
By these assignments, defendant contends that the trial court erred in allowing testimony by Ms. Dorothy Barnes and Mr. Benny Justice concerning the accused's expertise in the business of butchery. Defendant claims that the probative value of such testimony was outweighed by its prejudicial effect and that, for this reason, the testimony of these witnesses should have been excluded.
The relevance of this testimony has been discussed previously. By demonstrating the accused's proficiency in butchering and the peculiar manner in which the victim's legs had been amputated, the state sought to suggest the defendant's involvement in the killing. Though circumstantial, this evidence was highly probative as to the issue of the murderer's identityat least once the accused's presence in the deceased's home was established. Thus, the trial court did not abuse its wide discretion in permitting this testimony. State v. Alford, 384 So.2d 761 (La.1980); State v. Echols, 376 So.2d 1244 (La.1979).
Defendant also argues that, since Ms. Barnes' testimony concerned another alleged conversation with the accused, the state's failure to disclose its intent to use this conversation at trial rendered the witness' testimony inadmissible. C.Cr.P. art. 716(B); see Assignments 2, 7, 8, supra. At trial, Ms. Barnes related the details of a discussion which took place in her home about four or five days after the accused's arrival in New Orleans. During the course of this conversation, defendant told Ms. Barnes that he had learned how to be a butcher in the job corps; he then drew the leg of a cow on a piece of paper and showed her where to cut the leg so as to make a "nice clean cut of meat".
While the state did indeed fail to provide notice of its intent to use defendant's statements to Ms. Barnes it is clear that this failure in no way prejudiced the defense. C.Cr.P. art. 921; State v. Bonanno, supra. Prior to the instant trial, defendant's case had been tried twice, with the state's intent to use evidence of the accused's expertise in butchery becoming apparent at least at the first trial. Furthermore, Ms. Barnes' testimony was merely cumulative when viewed in light of extensive testimony by Mr. Justice, of whose testimony defendant had actual notice, regarding defendant's training as a butcher. Thus, there is no showing here that the absence of notice prevented the accused from properly preparing his strategy for trial. State v. Sneed, 316 So.2d 372 (La. 1975).
This assignment is without merit.

Assignment of Error Number 11
By this assignment, defendant argues that the trial court erred in refusing to declare a mistrial when the state allegedly made reference to the accused's failure to testify. C.Cr.P. art. 770(3).
During closing argument on rebuttal, the prosecution emphasized the apparent fact that defendant was standing near the deceased's body at the time of his second telephone conversation with Ms. Barnes:
"Would anybody who was innocent who was not involved in something stand over the telephone as you saw it. It's not a house with four telephones. He had to be in her bedroom on that telephone, stand over the dead body of his aunt right there on the floor on the phone, tell her daughter, `Aunt Louise went to the washer.' Would an innocent person do that? Of course not. If they just walked in and saw this, `Oh my God, your mother's dead!' Just what Mr. Pitts did. What *596 Mr. Richardson did. `Oh, my God!' and run out and call the police. That's what everybody would do. He can't explain to you why he lied. Why did he call early in the morning? I'll tell you, to find out what they were going to do. To find out if they were coming over to see Aunt Louise."
Defense counsel immediately objected to this latter statement as being a reference to the accused's failure to take the stand. Out of the jury's presence, the trial court then listened to a tape of the prosecutor's remarks and concluded that the statement "he can't tell you why he lied" was actually a reference to defense counsel's failure, during closing argument, to give some explanation for his client's apparent lie regarding Ms. Williams' whereabouts. Nevertheless, to ensure that this remark would not be construed as a reference to defendant's failure to testify, the trial court agreed to instruct the jury regarding the construction to be placed upon the prosecutor's remark.
We agree with the trial court's interpretation of the prosecutor's remark. At the beginning of the state's rebuttal argument, the prosecutor made it clear to the jury that the purpose for such argument was to allow the state "... the opportunity to address itself to you on points made by defense counsel." The prosecutor made no fewer than 14 references to defense counsel by name prior to the time of the objection, usually when juxtaposing what the state sought to prove with what defense counsel said to rebut it. The last reference to the defense counsel by name prior to the objection is found in the transcript, just 38 lines before the objection. There, the prosecutor stated "... Mr. Doussoy can't explain to you defendant's actions in those phone calls." This language makes it perfectly clear that the later remark was really a reference to defense counsel's failure to explain why the defendant lied during the telephone call and, therefore, was not a reference to the accused's failure to take the stand. C.Cr.P. art. 770(3). Rather, it was a permissible reference to the weaknesses of the defense theory of the case. C.Cr.P. art. 774.

Assignment of Error Number 12
In this assignment, defendant challenges the sufficiency of the state's evidence identifying him as Ms. Williams' murderer.
This assignment lacks merit. A review of the record containing the testimony and evidence previously discussed in the factual summary and other assignments of error, when viewed in the light most favorable to the prosecution, convinces us that any rational trier of fact could have found, beyond a reasonable doubt, that the defendant is guilty. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Morgan, 389 So.2d 364 (La.1980); State v. Harveston, 389 So.2d 63 (La.1980); State v. Hartman, 388 So.2d 688 (La.1980).
For the above reasons, the conviction and sentence of defendant are affirmed.
AFFIRMED.
DIXON, J., dissents with reasons.
DENNIS, J., concurs with reasons.
LEMMON, J., concurs and will assign reasons.
DIXON, Chief Justice (dissenting).
I respectfully dissent, finding error in the jeopardy assignment.
LEMMON, Justice, concurring.
When defendant rejected his attorney's advice that additional time was needed to prepare rebuttal for Mr. Justice's unanticipated testimony and insisted on proceeding with the trial, defense counsel concluded he could no longer furnish effective representation and sought to withdraw.[1] This ruptured *597 relationship between defendant and his lawyer presented the trial judge with the type of situation in which there was "manifest necessity" to declare a mistrial without the defendant's consent. See Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).
The judge obviously declared the mistrial in order to assure defendant a fair trial. Not only was the judge's action clearly beneficial to defendant, but also the ruling was rendered in defendant's interest. When the judge was confronted at an early stage of the trial[2] with choosing whether to allow the trial to proceed under the unfavorable conditions (as defendant requested) or to declare a mistrial over defendant's objection, the judge chose to abort the proceedings in order to allow defense counsel a fair opportunity to meet the state's evidence. As Justice Black wrote in Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949),
"[D]efendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." 336 U.S. at 689, 69 S.Ct. at 837.
Under these circumstances the protection afforded by the double jeopardy clause of the state and federal constitutions does not require dismissal of the present charges against the defendant.
NOTES
[1] We note that in State v. Bonanno, 373 So.2d at 1288 (La.1979), this Court stated, in dicta, that notice is required by C.Cr.P. art. 716 for the same types of statements for which notice is required by C.Cr.P. art. 768. Article 768 applies only to confessions or inculpatory statements while Article 716(B) is applicable to any oral confession "or statement of any nature". Thus, while Article 716 permits discovery of statements covered by Article 768, it is broader in scope than the latter.
[2] A defendant has a constitutional right to testify in his own behalf. La.Const. art. 1, § 16.
[3] C.Cr.P. art. 729.5 also allows a trial judge to grant a mistrial upon motion of the defendant when the state fails to comply with discovery orders issued pursuant to C.Cr.P. art. 716 et seq. The discovery provisions do not give a trial judge express authority to require disclosure of state witnesses to facilitate the giving of notice of alibi. In light of our holding, however, the issue of implicit authorization need not be reached.
[1] The trial judge correctly decided to allow the state to call the witness, despite the state's failure to include the witness' name on the list provided to the defense. The state was not required by C.Cr.P. art. 727 to reveal its intent to call Mr. Justice, because that witness could not refute an alibi defense. Mr. Justice could only testify concerning defendant's knowledge of the art of butchering cattle, and a witness' testimony showing special knowledge of the defendant is not within the scope of C.Cr.P. art. 727B.
[2] The mistrial was granted before the first witness was sworn. Although under Crist v. Bretz, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) jeopardy had attached for federal constitutional purposes, jeopardy under state law (C.Cr.P. art. 592) had not attached, and C.Cr.P. arts. 591 and 775 do not compel a finding of double jeopardy.

Thus, the only question is whether retrial in this case violates the federal constitutional protection afforded by the double jeopardy clause of the Fifth Amendment and not any additional protection provided by state law. Compare State v. Birabent, 305 So.2d 448 (La.1974), cert. den., 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41. See Illinois v. Somerville, above.