438 So.2d 605 (1983)
STATE of Louisiana, Plaintiff-Appellee,
v.
Jerry WILLIS, Defendant-Appellant.
No. CR82-792.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1983.
*606 Adam L. Ortego, Sulphur, for defendant-appellant.
Leonard K. Knapp, Jr., Dist. Atty., and Robert R. Bryant, Asst. Dist. Atty., Lake Charles, for plaintiff-appellee.
Before STOKER, DOUCET and KNOLL, JJ.
DOUCET, Judge.
The defendant, Jerry Willis, was charged by bill of indictment with the second degree murder (LSA-R.S. 14:30.1) of Thomas Chapman, arising from a shooting incident on July 1, 1981, at a tavern in Calcasieu Parish. Defendant pleaded not guilty, urging that he acted in self-defense, but was found guilty as charged at his subsequent jury trial in September 1982.[1] Pursuant to R.S. 14:30.1, defendant was sentenced to the mandatory penalty of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On appeal, defense counsel has assigned four assignments of error wherein he alleges that the following reversible errors occurred:
(1) The State's failure to tender to defendant at his request a transcript of his grand jury testimony and the grand jury testimony of John Roy Mears, Barbara Cornnors[2] and Jean Mazzola;
(2) The State being allowed to cross-examine Earl Cotton about an allegedly inculpatory statement made to him by the defendant, although no notice of the existence of that statement was provided by the State pursuant to its duties under LSA-C.Cr.P. Arts. 716, 768;
(3) The State's reference to the aforementioned statement in its closing remarks; and
(4) The trial court's decision to allow defendant's case to proceed to trial, despite the existence of grounds which would have purportedly justified the granting of a continuance.
Also, defendant has filed in this court a pro se brief assigning the additional assignments of error:
(1) Defendant was given ineffective assistance of counsel by his appointed counsel, Mr. Adam L. Ortego, Jr., who represented him during his trial (and upon this appeal) and conviction on second degree murder charges;
(2) Under the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defendant should have been allowed to impeach the credibility of one of the State's chief witnesses, John Roy Mears, by allowing the jury to be made aware of his criminal record;
(3) The prosecuting attorney lied with the rest of the State's witnesses and disavowed knowledge of the "fat boy," whose name the defendant is certain was called at the grand jury hearing; and
(4) The evidence, when viewed in the light most favorable to the prosecution, was insufficient to have convinced a rational fact finder beyond a reasonable doubt that defendant did not act in self-defense when he shot the victim twice.
*607 FACTS
Apparently, there were only four eyewitnesses[3] to the shooting which resulted in the death of the forty-year-old male victim, Thomas Chapman. Those witnesses were John Roy Mears, Barbara Cornnors, Jean Mazzola and defendant. Defendant has never denied that he fired twice into the victim's body, but he alleges that he was acting in self-defense. The only major conflicts in testimony are between the defendant and the other three, who testified as witnesses for the State. A synopsis of each of those witnesses' testimony is provided below.
On the evening of July 1, 1982, John Roy Mears, age 22, was drinking at Nola's Lounge in Calcasieu Parish. He observed the defendant making several "passes" at two of the female employees at the lounge, after which the victim (Chapman) intervened requesting the defendant to leave the girls alone. Mears observed no animosity between the defendant and the victim at that time but the defendant left the room to go outside, and then he shortly returned saying to Chapman, "If you want some trouble you son of a bitch, come outside." The victim finished shooting a game of pool, then walked outside. Mears had stepped outside just before the victim did, and he testified that he saw the victim walk slowly extending his hand toward the defendant, who was pointing, at Chapman's head, a gun he had pulled from his pants. According to Mears, Chapman said:
Why don't you put the gun up. [sic] You don't want to hurt nobody. Why don't you just give me the gun. [sic] (TR. 1)
During the victim's approach, the defendant took several steps backwards and then lowered the gun toward Chapman's stomach and fired twice. The victim told Jean Mazzola that he had been shot and then fell to his knees, whereupon Mears and Ms. Mazzola put him into Mears' car and rushed him to the hospital. Early the next morning, the victim died from the loss of blood from the gunshot wounds. Mears testified additionally that he did not, immediately prior to the shooting, hear defendant say anything; that he (Mears) did not personally know either the victim or the defendant and that he had not engaged in any dispute with the defendant; that he (Mears) and a "fat guy" had not approached the defendant in a threatening or otherwise manner (the significance of this will become apparent later); that Jean Mazzola followed the victim outside the lounge and saw the actual shooting; and that Mears heard two shots which were followed a short time later by a third, the origin of which was not established. The defendant fled the scene of the shooting, but was arrested approximately six months later in Galveston, Texas.
On the night of the shooting in question, Barbara Ann Cornnors was employed at Nola's Lounge in a quasi-managerial capacity. She had personally known the victim for approximately six months and had seen the defendant several times (2-3) at the lounge. On two separate occasions the defendant had that evening made overtures to Ms. Cornnors and Ms. Mazzolaeach of which resulted in the victim requesting the defendant to leave the women alone. However, Ms. Cornnors testified that Chapman (the victim) acted without anger and in a non-aggressive manner. Sometime later another woman (Anita Langley) came into the bar and engaged in a shouting argument with the defendant. The victim calmed this female and assured her that the defendant would not harm her. Following this episode, the defendant "stormed out the door", but he told Chapman in less than genteel words to come outside. A young man, Victor Sarvaunt, who was the grandson of "Nola", told Ms. Cornnors that the defendant had gone outside for a gun.
When Chapman went outside the bar he was followed by Cornnors and Mazzola, the latter telling Chapman that the defendant *608 had a gun. However, the victim said that he would talk to the defendant and calm him down, as he apparently had already done several times that evening. As Chapman approached the defendant in a slow and calm manner, requesting the defendant to give him the gun, the defendant kept backing up. Ms. Cornnors heard the victim say:
"Jerry, give me the gun. He said, you don't want to hurt nobody and nobody's going to hurt you." (TR. 1)
As the victim approached, the defendant shot him twice, the second coming after the victim had said, "I've been shot", and had turned around. A third shot was also heard (origin unknown). Ms. Cornnors testified, without objection, that the victim was not a violent person and that she had never seen him carry a weapon, nor was he armed at the time of the shooting. She also testified that only the victim was approaching the defendant.
Jean Mazzola, a witness who had been dating the victim, testified that the defendant and the victim had been shooting some games of pool and that the defendant had gotten into several arguments with other patrons, each of which had resulted in the victim acting as a peacemaker, calming the defendant in each instance. The rest of Ms. Mazzola's testimony was merely cumulative of that previously provided by Mears and Cornnors, with several minor exceptions. This witness stated that Chapman was only one foot from the gun when it was fired. She also did not remember hearing the second shot that struck the victim, although she did hear another shot as the defendant drove away.
Ms. Mazzola testified that she had never known Chapman to carry a gun, nor did he ever threaten the defendant. She stated that all the victim had done was to keep the defendant "out of trouble", and she had not seen anyone threaten the defendant in any way.
Initially, defendant admitted that he had been previously convicted of three crimes assault to commit murder, illegal possession of a firearm and possession of marijuana. Regarding the victim's character, defendant testified that he was "a friendly person" but was also "sort of a bully", and they had never exchanged cross words. Defendant acknowledged that he had made passes at the two women and that he had been "acting kind of ... kind of a fool...". According to defendant, Anita Langley (not present at trial) had previously tried to cheat him out of some money, and when she entered the lounge on that fateful evening, she began screaming that she was going to have the defendant whipped. The defendant stated that he feared for his safety when he saw John Roy Mears and a "big fat boy" walk into the lounge, so he attempted to leave, but upon so doing was followed out the door by the two men. At this time, Chapman was still in the bar.
The defendant testified that he had convinced the two men that Ms. Langley's situation was not worthy of a struggle and that they had returned to the lounge, when the victim "jumped out the door" followed by the two other men. As Mears and the overweight Mr. X[4] circled, the victim, saying repeatedly, "you got to get you some of it", slowly advanced to the retreating defendant who begged him not to come any closer and warned him that he was armed. Defendant testified that he tried to frighten Chapman into stopping, but his attempts were futile, so in fear of his well-being, he fired into the victim's lower body (he had been aiming at his head). After the first shot he stated that Chapman kept coming at him and that Mears threw a beer bottle at his head[5], so he fired another shot into the victim's body.
After this exchange Mears fled, and the fat boy grabbed the stricken Chapman, whereupon defendant fled in his car and was fired upon as he departed. He further *609 testified that he fled because he didn't want to go to jail. Noteworthy is defendant's testimony that he was armed when he entered Nola's Lounge on that evening and that he sometimes did arm himself prior to entering a bar. Sarvaunt testified that Cornnors and Mazzola were outside at the time of the shooting, although he was himself still inside the lounge. Sarvaunt further stated that the victim was not a violent person and that he had calmed Ms. Langley down, when the defendant challenged Chapman to go outside. Sarvaunt testified that he warned the victim to stay inside, because the defendant had probably gone to get his gun, but Chapman ignored his warning. He further stated that Mears did have a reputation for fighting in bars and that it "seemed" at the time that the defendant did not want any trouble on that night.
ASSIGNMENT OF ERROR NUMBER 1
Defendant avers in this assignment that irreversible error occurred when the State failed to provide him, as requested, a copy of his grand jury testimony and that of John Roy Mears and Jean Mazzola.[6] On February 19, 1982, the defendant did make a request for his testimony before the grand jury. Notwithstanding the minute entries on May 28, 1982, it is clear that the defendant was never provided with a copy of the requested testimony. This is especially supported by defendant's motion for a continuance on September 20, 1982, wherein a ground listed was the State's failure to comply with defendant's discovery demand. Defendant claims he was entitled to a copy of his grand jury testimony citing LSA-C. Cr.P. Art. 716, which provides as follows:
"A. Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph or otherwise reproduce any relevant written or recorded confession or statement of any nature, including recorded testimony before grand jury, or copy thereof, of the defendant in the possession, custody, control, or knowledge of the district attorney."
Clearly, the district attorney should have complied with the order.
However, noncompliance with discovery procedures will not mandate reversal if the defendant has not been prejudiced by the State's failure to act. State v. Mitchell, 412 So.2d 1042 (La.1982); State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Roussel, 381 So.2d 796 (La.1980); LSA-C.Cr.P. Art. 921. In the instant case we have not been shown how the State's failure to provide the defendant with a copy of his grand jury testimony prejudiced him to any degree. With one exception, there were no allusions at trial to that earlier testimonythe exception being defendant's own statement that his testimony at trial did not differ from that given before the grand jury.
Defendant also argues that he was entitled to the grand jury testimony, or in the alternative to an in camera inspection, of Mears and Mazzola in order to impeach their trial testimony. This precise issue was recently addressed by our Supreme Court which held as follows:
The general rule is that the proceedings of the grand jury are to be kept secret. C.Cr.P. Art. 434(A). State v. Sheppard, 350 So.2d 615 (La., 1977). The transcript generally may not be used at trial even in the conduct of cross-examination. State v. Prestridge, 399 So.2d 564 (La., 1981). The purpose of this rule is to encourage the full disclosure of information about crimes. State v. Prestridge, supra.

The testimony of a witness before the grand jury may not be used in Louisiana for cross-examination, unless the testimony requested falls within one of two exceptions mentioned in Code of Criminal Procedure, Article 434. State v. Martin, 376 So.2d 300 (La., 1979). Cert. den. 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297. The exceptions are as follows:
"However, after the indictment, such persons may reveal statutory irregularities *610 in grand jury proceedings to defense counsel, the attorney general, the district attorney, or the court, and may testify concerning them. Such persons may disclose testimony given before the grand jury, at any time when permitted by the court, to show that a witness committed perjury in his testimony before the grand jury. A witness may discuss his testimony given before the grand jury with counsel for a person under investigation or indicted, with the attorney general or the district attorney, or with the court." C.Cr.Part. 434.
In the case of State v. Peters, La., 406 So.2d 189, this court allowed an inspection in camera, of the grand jury testimony of a state witness who admitted to defense counsel that she had perjured herself before the grand jury. In that case, specific information could be provided to the court of the existence of inconsistent statements. The Court has consistently held that a trial judge is not required to grant an in camera inspection in response to a defendant's general request for grand jury testimony. State v. Martin, supra. State v. Lewis, 353 So.2d 703, State v. May, 339 So.2d 764 (La., 1976).
In this case there was no showing that the testimony of Ms. Deland fell within the two previously discussed exceptions to disclosure of grand jury testimony. The request by the defendant merely sought to ascertain whether any such inconsistent statements existed. This is not a sufficient showing by the defendant to impinge upon the secrecy of the grand jury. The trial judge did not err in refusing to order the State to produce Ms. Deland's grand jury testimony and in refusing an in camera inspection of this testimony.
State v. Ates, 418 So.2d 1326, 1329-1330 (La.1982).
Although we find that language both applicable and controlling to defendant's claims, we pretermit deciding this assignment on the aforementioned grounds (lack of prejudice and State v. Ates).
When an accused has made a request for discovery, which has not been complied with by the State, he must draw this nonproduction to the attention of the trial judge who is able to require the necessary production. A failure to object at trial constitutes a waiver of the objection. State v. Naas, 409 So.2d 535 (La.1981) (On rehearing); State v. Jones, 408 So.2d 1285 (La. 1982); LSA-C.Cr.P. Art. 841. Also, see State v. Walker, 432 So.2d 1057 (La.App. 3rd Cir.1983) (Vacated and remanded for other reasons). In the case sub judice defense counsel failed to complain at trial of the State's failure to honor his discovery request and has thereby waived his right to object to this on appeal. This assignment does not warrant reversal.
ASSIGNMENTS OF ERROR NUMBERS 2 AND 3
By these assignments, defendant contends that a reversible error was committed when the State was allowed to cross-examine one of defendant's witnesses about an inculpatory statement made by defendant without giving defendant the requisite notice of the statement and without laying a proper foundation for its admissibility. Counsel also contends that a reversible error occurred when the State adverted to this statement in its closing remarks. The statement in question was revealed by the following colloquy between the prosecutor and Earl Cotton:
"Q. How did Jerry tell you that he settled his arguments?
A. Guns.
Q. With what?
A. Guns.
Q. With guns? Didn't he tell you that he never gets in a fight with anyone, he uses a gun?
A. Yes, sir."
The statement attributed to defendant (Jerry) was made to defendant's jail-mate, Cotton, after the death of the victim, Chapman, but prior to defendant's trial.
*611 Article 768 of the Code of Criminal Procedure, creating the State's disclosure duty, states as follows:
"Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence."
The distinction between a confession and an inculpatory statement is that the former admits commission of the crime, whereas the latter "admits a fact, circumstances or involvement which tends to establish guilt or from which guilt may be inferred." State v. Brumfield, 329 So.2d 181, 187 (La. 1976). And the term "inculpatory statement" in this article refers to an accused's out-of-court admission occurring after a crime, which implicates or incriminates the speaker as to the commission of that crime. State v. Brent, 347 So.2d 1112 (La.1977); State v. Brumfield, supra; State v. Wells, 306 So.2d 695 (La.1975).
It cannot be gainsaid that the State failed to notify defendant of its intent to introduce Cotton's testimony as to defendant's remarks. In its answer to defendant's motion for discovery, the State denied knowledge of any inculpatory oral statements[7] by defendant, but agreed to notify him of the existence of any such statements should they surface. This material is also discoverable (as to its existence) under LSA-C.Cr.P. Art. 716, and the State is under the continuing duty to provide defendant with the requested information, should its existence subsequently be made known. State v. Hammler, 312 So.2d 306 (La.1975); LSA-C.Cr.P. Art. 729.3. (emphasis ours).
Although the State's failure to comply with a defendant's appropriate discovery request will not always necessitate a reversal, if the defendant is prejudiced by the State's noncompliance he is entitled to a reversal. State v. Ray, 423 So.2d 1116 (La. 1982); State v. Mitchell, supra. In Mitchell the Supreme Court reversed and remanded the defendant's conviction for indecent behavior with a juvenile, when the State failed to timely provide the defendant with a copy of an inculpatory statement (written) in its possession. The State argued that it had only received a copy of the statement on the day that it was used during its (the State's) cross-examination of defendant. However, in rejecting the State's argument, the court observed that it had received notice of the statement's existence on the previous day, but had not notified defendant of it until after the State had reopened its case, questioned a witness, closed its case-in-chief and after defendant had testified under direct examination. The court held that this action denied that defendant the substantial right to prepare an adequate defense. Also, see State v. Davis, 399 So.2d 1168 (La.1981). (On Joint Motion for Rehearing/Clarification). The decision in Mitchell was primarily grounded upon fundamental fairness and the following discovery articles of the Code of Criminal Procedure:
LSA-C.Cr.P. art. 729.3 provides:
If, subsequent to compliance with an order issued pursuant to this Chapter and prior to or during trial, a party discovers additional evidence or decides to use additional evidence and such evidence is or may be, subject to discovery or inspection under the order issued, he shall promptly notify the other party and the court of the existence of the additional evidence, so that the court may modify its previous order to allow the other party to make an appropriate motion for additional discovery or inspection:
LSA-C.Cr.P. art. 729.5 provides:
A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, *612 order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.

* * * * * *
It should be noted that, if the State did not know of the inculpatory statement and did not attempt to solicit it from the witness but, rather it was revealed to both the State's and defendant's surprise, there is held to be no violation of the State's duty to provide notice set forth in C.Cr.P. Art. 768. State v. Smith, 327 So.2d 355 (La.1975) (On rehearing). However, it appears from the way the State framed its question, that it was aware of, and did solicit the answer the witness, Cotton, providedi.e., that the defendant never engaged in a fight (presumably, using his hands) but instead settled his arguments with a gun. As the State has failed to reply to defendant's allegations, it will be assumed arguendo that the State did know of Cotton's testimony beforehand, rendering State v. Smith inapposite.
However, the question arises as to whether defendant's statements to Cotton were incriminating, because only if they were will they be inculpatory statements for purposes of Articles 716 and 768. State v. Dimopoullas, 260 La. 874, 257 So.2d 644 (La.1972). In State v. Bodley, 394 So.2d 584 (La.1981), the Supreme Court addressed the question of whether certain statements were inculpatory under article 768. Those statements were given at a known time by the defendant and were to the effect that the victim was alive and well at that time. However, medical testimony at trial established that the victim was, in fact, dead at the time of the defendant's statements as to her well-being. The court in Bodley found that the statements were not inculpatory and, therefore, the State was not required to provide the defendant with notice of their existence under Article 768. This finding was premised on the following rationale:
"Defendant made no statements of fact which establish any element of the crime of murder of their own force. Rather, the statements were exculpatory in nature. * * * They were not damaging to the defense until coupled with Dr. Samuel's opinion that the victim was already dead at the time the alleged statements were made." 394 So.2d at 589.
This being true, the defendant's only recourse was held to be through the discovery articles, which the State had failed to properly comply with, but this was not fatal as the defendant was found to have suffered no prejudice, due to his earlier constructive knowledge of the statements, precluding any claims of surprise.
It is certainly arguable that the present defendant's alleged statement was not one which implicated him with the death of the victim or that it created the inference of guilt with that respect to that death. However, the question is made difficult by the defendant's claim of self-defense. If the defendant did state that he always settled his arguments with a gun and, if the jury chose to believe this statement, then defendant's self-defense claim would be severely damaged by the newly-released statement. In fact, the trial court in his jury instructions correctly stated that the State had the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense when he shot the victim. See State v. Pittman, 428 So.2d 979 (La. App. 1st Cir.1983); State v. Patterson, 295 So.2d 792 (La.1974).
Assuming, arguendo, that the statement was inculpatory, then defendant was entitled to notice of it under Articles 768, 729.3, and 716 of the Code of Criminal Procedure. The question then becomes whether the State's failure to provide notice so prejudiced defendant as to require reversal of defendant's conviction. For, if the defendant had reason to expect Cotton to testify as he did, or if there is overwhelming evidence of defendant's guilt, any error that occurred may be deemed harmless with no need for a reversal. State v. Perry, 408 So.2d 1358 (La.1982); State v. Smith, 401 So.2d 1179 (La.1981); State v. Bodley, supra.
*613 Although it appears that the overwhelming evidence of defendant's guilt presented at trial[8] would render harmless any error which may have occurred when the State failed to notify defendant of Cotton's forthcoming statements, we again choose to reject these assignments because of defense counsel's failure to timely object at trial. Failing to allow the trial court to correct such errors when they occur, constitutes a waiver of objection on appeal. State v. Naas, supra; State v. Jones, supra; State v. Bonanno, 373 So.2d 1284 (La.1979); LSA-C. Cr.P. Art. 841. In this case defendant again failed to object timely to Cotton's testimonyeither during its rendition or after the State alluded to it in closing.[9] He has, therefore, waived all objections to that testimony upon this appeal. These assignments do not warrant reversal.
ASSIGNMENT OF ERROR NUMBER 4
Defendant alleges that the trial court erred in allowing him to go to trial despite the existence of grounds which should have justified a continuance. On September 20, 1982, the defendant filed a motion for a continuance based on various grounds. The hearing on this motion was held that same afternoon before Judge William Swift, who opined that the inadequacy of the State's response to defendant's discovery request would provide adequate grounds to grant defendant a continuance.[10] However, we find that this issue presents nothing for use to review, as the defendant, against his counsel's advice, chose to waive his right to a hearing on the continuance. The sound discretion of the lower court was not abused by its honoring of defendant's request to forego a hearing on his continuance motion and to proceed directly to trial. State v. Huizar, 414 So.2d 741 (La.1982).
PRO SE ASSIGNMENT OF ERROR NUMBER 1
Defendant argues that he was not given the assistance of effective counsel at trial. This issue is more properly raised by a writ of habeas corpus, which allows the trial court to order a full evidentiary hearing into the petitioner's allegations. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Buckenburger, 428 So.2d 966 (La.App. 1st Cir.1983). In the absence of a record sufficiently addressing defendant's claim, this assignment presents nothing for us to review and is, therefore, without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 2
Defendant contends that his counsel should have been allowed to impeach the credibility of John Roy Mears through the use of Mears' "criminal record". In his pro se brief defendant alleges that Mears perjured himself when he "claimed under oath that he'd never been arrested for a felony." An examination of the record reveals, however, that Mears was questioned as to any convictions he may have had. To this question, the witness responded negatively.[11]
We, therefore, find that Mears did not perjure himself and that the defendant is merely requesting that he should have been allowed to introduce before the jury the witness' arrest record of unconvicted and *614 untried charges. This is prohibited by LSA-R.S. 15:495:
Evidence of conviction of crime, but not of arrest, indictment or prosecution, is admissible for the purpose of impeaching the credibility of the witness, but before evidence of such former conviction can be adduced from any other source than the witness whose credibility is to be impeached, he must have been questioned on cross-examination as to such conviction, and have failed distinctly to admit the same; and no witness, whether he be defendant or not, can be asked on cross-examination whether or not he has ever been indicted or arrested, and can only be questioned as to conviction, and as provided herein.
The jurisprudence has strictly applied the wording of that article. State v. Huizar, supra; State v. Elizey, 407 So.2d 1204 (La. 1981).
PRO SE ASSIGNMENT OF ERROR NUMBER 3
Defendant alleges that the prosecutor lied when he stated that he did not know of any "fat boy", whom the defendant contends was one of his attackers. Although defendant avers that this witness' name was called during the grand jury hearing, the prosecuting attorney denied that he had any information of a "fat boy". Defendant has not presented the name of this mysterious witnessa name he allegedly heard called during the grand jury proceedings, and this matter presents no reviewable issue on appeal.
PRO SE ASSIGNMENT OF ERROR NUMBER 4
The defendant contends that all of the State's witnesses and the prosecution were lying and in concert in their attempts to convict him of the victim's death. This argument is properly considered an appeal to the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and adopted by Louisiana jurisprudence. State v. Byrd, 385 So.2d 248 (La.1980). Due process of law requires that no person be made to suffer the onus of a criminal conviction except upon sufficient factual proof of every essential element of the crime charged. Jackson v. Virginia, supra. In order to sustain the jury's finding under the Jackson v. Virginia standard, we must determine whether the evidence, viewed in a light most favorable to the prosecution, could have convinced a rational fact finder beyond a reasonable doubt that the defendant did not act in self-defense when he twice fired into the body of Thomas Chapman.
The State's three eyewitnesses were steadfast in their assertions that the victim was not the aggressor and that he alone approached the defendant in a non-threatening manner, requesting the defendant to give him the gun. The defendant contends that this testimony is nothing more than "a pack of lies". The credibility of the witnesses and the weight to be attached to the testimony of each is to be determined by the appropriate finder of facts, which in this case was the jury. State v. Wright, 410 So.2d 1092 (La.1982); State v. Klar, 400 So.2d 610 (La.1981). The jurors clearly chose to believe the State's witnesses, and we find that this decision substantiated a finding under the standard of Jackson v. Virginia that the defendant did not act in self-defense when he shot the victim.
For the reasons assigned hereinabove, defendant's conviction and sentence for the second degree murder of Thomas Chapman is affirmed.
AFFIRMED.
NOTES
[1] The guilty verdict was by a unanimous jury vote (12-0), following only one hour's deliberation.
[2] Mrs. Cornnors testified at trial that she never appeared before the grand jury and this statement, not being controverted by defendant, makes moot any consideration of her non-existent grand jury testimony.
[3] There is a possibility that other persons were present during the shooting but the State failed to produce them.
[4] Defendant avers that the "fat boy's" name was called during grand jury, but the prosecuting attorney disavowed any knowledge of whom defendant was referring.
[5] Mears denied that he had thrown a bottle at defendant or that he had even taken a bottle outside with him.
[6] There is no direct indication that Mears or Mazzola have ever testified before the grand jury, but it is assumed for purposes of this assignment that they did so testify.
[7] Defendant had given a written statement which was ordered suppressed by the trial court on the grounds that defendant's rights to counsel had been violated.
[8] Each of the eyewitnesses testified that the defendant was the aggressor, and they were in agreement as to all of the pertinent facts. Only the defendant disagreed, calling their testimony "a pack of lies".
[9] Counsel for the defendant avers that he did object to Cotton's testimony but the record does not substantiate this claim. (Brief, p. 6).
[10] The ground considered meritorious by Judge Swift was defense counsel's desire to have suppressed certain statements by defendant. Those statements were not directly inculpatory and were, in fact, never presented at trial by the State.
[11] Defendant's proffer of Mears' criminal record reveals a lengthy arrest record, but there is no indication that he had been convicted of any of the charged crimes. Defense counsel was not unaware of LSA-R.S. 15:495 and its sanctions against the introduction of arrest records, and he apparently attempted to argue (under R.S. 15:492) that Mears was biased in favor of the State in the hope of receiving leniency as to some pending charges against him. The trial court rejected this argument, and counsel did not perfect his objection to this ruling on appeal. LSA-C.Cr.P. Art. 844.