638 So.2d 1216 (1994)
STATE of Louisiana,
v.
Dale GAUDET.
No. 93 KA 1641.
Court of Appeal of Louisiana, First Circuit.
June 24, 1994.
*1217 Stephen E. Caillouet, Asst. Dist. Atty., Thibodaux, for State.
James L. Alcock, Houma, for defendant-appellant Dale Gaudet.
Before LOTTINGER, C.J., and CRAIN and LeBLANC, JJ.
LOTTINGER, Chief Judge.
Dale Gaudet, defendant, was convicted of second degree murder. La.R.S. 14:30.1. Defendant appeals his conviction.

FACTS
On February 18, 1984, Connie Guidry Gaudet ("the victim") mysteriously disappeared. The victim, who had been married to defendant since September 1978, had two young daughters, ages four and one. On the day of her disappearance, the victim worked until 6:30 p.m., picked up her two daughters from their grandmother's care, and returned to the house she shared with defendant in Lockport, Louisiana. The youngest daughter's *1218 second birthday was approximately one week away. The victim was twenty-three years of age at the time of her disappearance.
Defendant claimed that on the night of the victim's disappearance, he went to bed at approximately 9:00 p.m. Defendant claimed that the last time he saw the victim was at around midnight. Further, defendant claimed that he was awakened the following morning by a telephone call from the victim, who stated that she had left with a friend. Defendant claimed that he received this call at approximately 7:00 a.m.
Ethel Guidry, the victim's mother, received a letter purportedly written by the victim a few days later. The letter disclosed that the victim left defendant and her two daughters for another man named "Ted." Furthermore, although the letter indicated that the victim abandoned her family to "see the world" and to obtain "a new beginning," she promised to return home one day. Moreover, the letter was replete with patronage towards defendant, stating how hard he tried to be a good husband and father. Strangely, although the letter indicated that the victim was writing "on the run," apparently meaning that she was on her way to Ted's hometown, the envelope revealed that it was postmarked in Lockport, Louisiana. Forensic examination established that the letter, which was incorrectly addressed, was not written by the victim.
Defendant told various persons that he received several telephone calls from the victim after her disappearance. Further, defendant told one person that he visited the victim on one occasion following her disappearance. However, aside from defendant, no one claimed to see or hear from the victim after she mysteriously vanished.
Out of suspicion, the victim's family contacted the Lafourche Parish Sheriff's Office shortly after she disappeared. Thereafter, the police questioned defendant about his wife's disappearance. During the course of the investigation, defendant gave recorded statements to the police in February 1984, and December 1987. However, some of defendant's 1987 statements do not appear to be in harmony with his initial account of the events that transpired around the time of the victim's disappearance.
For example, on February 21, 1984, defendant initially told the police that he was sleeping at the time he received the alleged telephone call from the victim informing him that she had abandoned him and their two girls. However, on December 8, 1987, defendant stated that on the morning following the victim's disappearance, he was in the process of preparing his daughters' breakfast when he received this call. Additionally, on February 21, 1984, defendant told the police that the victim departed with two suitcases containing her dress clothes. Defendant added that she did not take "very many of her everyday clothes." Yet, on December 8, 1987, defendant told the police that the victim left with half of her clothing.
When questioned about any reason the victim might have had to abandon her two children, defendant told the police "the pressure from the kids was just starting to get to her." Furthermore, defendant admitted to the police that he was having a relationship with another woman, Donna Foret, at the time of the victim's disappearance. The police told defendant that the circumstances surrounding the victim's disappearance suggested foul play. Although the police informed defendant that he would be their prime suspect if they had evidence of foul play, defendant denied killing his wife.
Following her disappearance, defendant filed for a divorce from the victim. Defendant obtained the divorce. Subsequently, in June 1985, defendant married Donna Foret. Defendant and Foret were married until November 1988. During her marriage to defendant, Foret lived in the same house that defendant shared with the victim.
In February 1991, defendant sold the residence he had shared with the victim to Joyce Toups. Simultaneously, defendant purchased Toups' residence from her. In November 1991, after inheriting another residence from a relative, Toups sold the house she had bought from defendant to Jerry and Monica Knight. The Knights financed the purchase of defendant's former house. However, the Knights' mortgage was conditioned, in part, upon replacement of the sewer system. *1219 The Knights contacted defendant and asked him for information on the drain fields. Defendant met with the Knights and the sewer contractor to determine the best location to place the system.
At the time defendant met with the Knights, a small cement slab, the remnant of a greenhouse that had been torn down, was adjacent to a fence. Defendant suggested that the excavation be as close to the fence as possible. Furthermore, defendant advised the Knights to avoid the area around the slab because of tree stumps. Defendant left the Knights believing that they would follow his advice. Ultimately, the Knights and the contractor decided to place the system in a location different from the one suggested by defendant. On November 6, 1991, work was begun on the installation of the system. The work was completed a few days later. During the installation process, the slab was broken up by heavy machinery.
On Sunday, November 10, 1991, Jerry Knight decided to clean the yard following the installation project. While cleaning, he discovered what appeared to be part of a human jawbone lying on the soil surface. The Knights brought the bone to a family physician. The physician concluded the bone was of human origin, but deferred to a pathologist for a final confirmation. After further examination established the sample was from a human skeleton, the police excavated the yard. A substantial portion of a skeleton, wrapped in a mattress cover, was exhumed. Moreover, dental records established that the remains removed from the yard were those of the victim. Thereafter, defendant was arrested and charged with her murder.
Defendant was indicted by the Lafourche Parish grand jury for the second degree murder of his wife. He was tried by a jury, which convicted him as charged. The trial court imposed the mandatory penalty of life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence.[1] Defendant appeals, urging twenty-seven assignments of error. However, defendant specifically abandoned assignments of error number four, five, six, eight, nine, ten, twelve, eighteen, nineteen, twenty and twenty-two. The remaining assignments of error are briefed by defendant in six arguments.

ISSUES
The presentation of defendant's briefed assignments of error raises the following six questions for our review: First, was defendant prejudiced through the discovery process with the state? Second, did the trial court err by denying defendant the opportunity to inform the jury that he had taken and passed a voice stress test? Third, in light of the spousal privilege, did the trial court err by allowing defendant's second wife to testify about statements that he made concerning the victim? Fourth, in light of the chain of custody of the evidence, did the trial court err by allowing the state to introduce the skeletal remains and clothing unearthed from the burial site? Fifth, was the evidence insufficient to support defendant's conviction? Sixth, is defendant entitled to a new trial?

DISCOVERY
Through assignments of error numbers one, two, three, seven, eleven, thirteen, fourteen, fifteen, sixteen, seventeen and twenty-one, defendant submits that the trial court erred by permitting the state to introduce statements made by defendant to several individuals. The statements at issue were made by defendant during a time span that commenced prior to the victim's disappearance and ended with the discovery of her skeletal remains. Defendant argues that despite his request for discovery, the state's notices were deficient. Accordingly, defendant complains that the state either failed to provide him with the specific dates the statements were made or failed to give him the exact locations where the statements were uttered. Hence, defendant contends that it *1220 was impossible for him to reconstruct the conversations and build a defense. Furthermore, defendant argues that given the length of time between the conversations at issue and the institution of prosecution, fairness required disclosure of the substance of the statements. However, defendant acknowledges that La.Code Crim.P. art. 716(B) does not require the state to provide notice of the contents of statements made in non-custodial situations.
La.Code Crim.P. art. 716(B) provides as follows:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
The discovery rules embodied in the Louisiana Code of Criminal Procedure are intended to eliminate unwarranted prejudice which could arise from surprise testimony. Louisiana's discovery procedures enable the defendant to properly assess the strength of the state's case against him so that he can prepare a defense. If a defendant is lulled into a misapprehension of the strength of the state's case by the state's failure to fully disclose required information, prejudice may result, constituting reversible error. State v. Roy, 496 So.2d 583, 590 (La.App. 1st Cir. 1986), writ denied, 501 So.2d 228 (La.1987). However, the state's failure to comply with discovery procedures will not automatically demand a reversal. State v. Burge, 486 So.2d 855, 866 (La.App. 1st Cir.), writ denied, 493 So.2d 1204 (La.1986). Accordingly, a conviction should not be reversed because of an erroneous ruling on a discovery violation absent a showing of prejudice. See State v. Norwood, 396 So.2d 1307, 1309 (La. 1981). See also State v. Bodley, 394 So.2d 584, 590 (La.1981). Moreover, a conclusionary allegation is not sufficient to establish prejudice, being that a defendant must show how he might or could have altered his defense strategy had the state properly complied with discovery procedures. See State v. Whitaker, 489 So.2d 998, 1003 (La.App. 1st Cir.), writ denied, 494 So.2d 324 (La.1986).
In the case at hand, aside from the physical evidence of the remains discovered buried in the yard of the residence defendant shared with the victim, the state's case consisted primarily of circumstantial evidence. Testimony that defendant claimed to have spoken to the victim on a number of occasions after her disappearance obviously contrasted with the discovery of her skeleton in the yard and defendant's inability to explain why her remains were found there. Many of the statements at issue were casual comments made by defendant throughout the years following the victim's disappearance and concerned her alleged contacts with him. Some of the statements were made contemporaneously with the victim's disappearance and were defendant's attempts to anticipate her eventual disappearance or to explain her absence.
None of the statements at issue were inculpatory, except with reference to other evidence adduced to show that the statements were false. Regarding the timing of the statements made by defendant, the state's discovery notices indicate that the approximate or specific date each statement was made was provided where possible. Naturally, some of the statements were not susceptible to ready recollection of a specific date. Nevertheless, at issue is the general time frame, a time span which corresponds between the days preceding the victim's disappearance and the discovery of her remains. Although this span of time is vast, most of the state's notices reflect that the statements introduced were restricted to a limited period of time, if not a particular date.
Some of the statements defendant made to Donna Foret, and the statements made to Linda Rochel and Charlotte Tabor Leblanc, were not limited to a particular period of time. Leblanc testified that defendant told her that his wife had been seen in Houma with the man for whom she had left him. That testimony is cumulative to the properly identified testimony of Joe Watson, which is discussed below. Moreover, it is principally in accordance with defendant's own testimony concerning an alleged anonymous telephone *1221 call he received the week after his wife's disappearance.
Rochel testified that around mid-1987, defendant told her he had seen the victim in a hotel room. Defendant asserted that the victim called him to discuss problems with her boyfriend. However, defendant denied making these statements, claiming that Rochel had "hard feelings" toward him because he had loaned her $1500.00 which she never had repaid.
With regard to the statements to Foret, the state's discovery notice reflected as follows:
1) Beginning in 1982, Dale Gaudet made numerous statements to Donna Foret including but not limited to his relationship with his wife, Connie Gaudet, and his desire to end the relationship. These verbal statements occurred prior to Connie Gaudet's disappearance and continued on after her disappearance during the time that Dale Gaudet and Donna Foret were legally married.
Furthermore, the state's discovery notice of the statement made to Rochel reflected that it was made after February 18, 1984.
Defendant testified that he and the victim had been having marital difficulties for several months prior to her disappearance. Defendant admitted that he was involved in a sexual affair with Foret during his marriage to the victim. Foret testified that she and defendant discussed the possibility of marriage prior to the victim's disappearance. Also, Foret testified that defendant claimed the victim left town with $20,000.00 the week before she disappeared. However, defendant claimed that he did not discuss marriage with Foret until after the victim had disappeared. Defendant also denied making the statement concerning the victim's departure with $20,000.00.
Defendant testified on his own behalf. Because defendant either admitted or specifically denied that he had made certain statements, the absence of information that would have more particularly identified the location where each statement purportedly took place was not critical to his recollection of the conversation or his defense.
Defendant does not claim, nor does it appear, that he was either surprised by the testimony of Rochel and Foret or was misled about the strength of the state's case. Hence, we find no prejudice simply because the specific time these statements were made was not provided. Additionally, the state's discovery notices did not identify most of the statements by the location of the conversations. Nevertheless, as with the timing of the statements previously discussed, it does not appear that the absence of this identifying information prejudiced defendant's ability to defend against the implications derived from the statements. We notice that defendant does not allege how he could have altered his defense strategy had the state properly complied with discovery. In sum, we hold that the exact time when the statements were uttered, and the pinpoint location where the divulgences occurred, were not crucial to defendant.
Finally, defendant submits that he was entitled to the contents of the statements prior to trial because of the vast length of time between the making of the statements and his trial. However, defendant recognizes in his brief that La.Code Crim.P. art. 716(B) does not require disclosure of the contents of these statements. In light of La.Code Crim.P. art. 716(B), we hold that defendant was not entitled to such disclosure. Nevertheless, as discussed above, we note that defendant had no apparent difficulty recalling the occasions on which these statements were made. Hence, assuming arguendo that the Louisiana Code of Criminal Procedure required the state to disclose the contents of the statements, there is no support for defendant's claim that such disclosure was necessary to insure a fair trial. Thus, we would have found no prejudice to defendant.
Accordingly, defendant's assignments of error are without merit.

VOICE STRESS TEST
Through assignment of error number twenty-three, defendant submits that the trial court erred by granting the state's motion in limine which denied him the opportunity to inform the jury that he had taken and passed *1222 a voice stress test. Defendant acknowledges that introduction of this type of evidence is contrary to settled jurisprudence. Nevertheless, defendant argues that the exclusion of the evidence resulted in a denial of his constitutional right to a fair trial because he was unable to present all of the salient facts to the jury.
The results of a voice stress analysis test are not admissible at trial. State v. Higginbotham, 554 So.2d 1308, 1310 (La.App. 1st Cir.1989); State v. Arnold, 533 So.2d 1311 (La.App. 3d Cir.), writ denied, 534 So.2d 959 (La.1988). See State v. Schouest, 351 So.2d 462, 468-469 (La.1977). See also State v. Foret, 628 So.2d 1116, 1127 (La.1993) (adopting the test for the admissibility of expert scientific testimony set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and noting that, "[t]estimony by an expert is not particularly helpful to a jury that must rely upon its own common sense as a barometer for the evaluation of truthfulness."). Thus, the trial court did not err in refusing to permit the introduction of this evidence.
Accordingly, defendant's assignment of error is without merit.

SPOUSAL PRIVILEGE
Through assignment of error number twenty-four, defendant submits that the trial court erred by permitting his second wife, Donna Foret, to testify about the statements he made concerning the victim. Defendant argues this evidence was introduced in violation of the spousal privilege.
La.Code of Evid. art. 504(B), establishing the spousal privilege to confidential communications, provides as follows:
Each spouse has a privilege during and after the marriage to refuse to disclose, and to prevent the other spouse from disclosing, confidential communications with the other spouse while they were husband and wife. (Emphasis added.)
Whether a particular communication is protected as a confidential communication is a question of fact to be determined by the trial court. Accordingly, the trial court must assess the totality of the circumstances surrounding the alleged confidential communication and the probable intent of the divulging spouse at the time it was made.
Defendant and Foret were married from June 1985, to November 1988. At trial Foret testified about three separate incidents wherein she overheard defendant apparently "speaking" to the victim when he was unaware that she could hear him. The first occasion was before their marriage. Foret testified that she was in defendant's bedroom, seated at his desk, when defendant emerged from the shower. As he looked in the mirror, wiping his face with a towel, defendant stated, "Connie, I'm so sorry I did what I did. I miss you. The kids miss you." Defendant then noticed that Foret was in the room. She and defendant argued over the remarks. Further, Foret wanted to leave. However, defendant ordered her to stay and not to let anyone know she was upset by what she had heard. Foret did as he instructed.
After the couple was married, Foret overheard defendant apparently speaking to the victim one morning as he was getting ready for work. She heard him call the victim's name. Then, she heard him compliment the victim on the meal she had prepared the preceding evening and how well she had done with the children because they were learning to behave better and "they have just become a whole loving family." Apparently, defendant was attributing Foret's actions to the victim. Foret became upset and questioned him about the comments. However, defendant denied making the statements, telling her that she was "hearing things."
The third statement overheard by Foret occurred after she sustained an illness precluding sexual intercourse for several weeks. On the night that she and defendant resumed sexual relations, Foret overheard defendant in the bathroom, addressing the victim and telling her how well the children were doing and how pleased he was with their conduct. Then, defendant stated, "Connie, you were the best lover tonight that you ever have been." Foret testified that she confronted defendant about the statements when he came out of the bathroom. However, defendant *1223 denied making the statements, telling her that she was dreaming.
The legislature enacted La.Code of Evid. art. 504(B) to instill and preserve confidence within the marital relationship. However, not every word uttered by one spouse that happens to be heard by the other spouse is entitled to this shield of secrecy. Hence, as emphasized above, the spousal privilege applies only to confidential communications "with" the other spouse. Although "confidential communications" embody both words and acts, the privilege only extends where the information was intentionally imparted to the other spouse. In other words, there must be an intentional sharing of the confidential information.
The first instance about which Foret testified occurred prior to their marriage. Hence, the spousal privilege does not even arguably extend to this instance. The other two statements were remarks made by defendant which he apparently did not intend for Foret to hear.
In determining that the statements were admissible, the trial court ruled as follows:
The words of a statute, of course, are supposed to be given their ordinary meaning. And as I read 504(B) what is protected here is not the generalized interest in privacy, but specifically communications with the spouse, communications between one spouse and another spouse.
Accordingly, I interpret Article 504 as excluding from the privilege statements that were made in the presence of the spouse that were not in fact, and not intended to be, communications or expressions by one spouse with the other. I think that had the legislature intended to give a broader protection to protect a broader interest, it easily could have done so.
The trial court's reasoning is correct. As evidenced from the context in which they were made, these statements were not intended to be communications between defendant and Foret. Although defendant claims that he obviously intended for Foret to hear the statements because he was on notice of her distress after hearing the first incident, the circumstances under which the comments were made, especially the fact that on both occasions defendant apparently believed Foret was asleep in an adjacent room, simply do not support his claim that the communication was intentional.
Accordingly, defendant's assignment of error is without merit.

CHAIN OF CUSTODY
Through assignment of error number twenty-five, defendant submits that the court erred by permitting the state to introduce evidence when the state failed to establish a proper chain of custody. The exhibit to which this argument relates consisted of the skeletal remains of the victim and clothing recovered from the burial site. Defendant argues that "[t]he circuitous, undocumented route taken by the remains from their unearthing to the courtroom defied proper identification for receipt into evidence." Furthermore, defendant alleges that the retrieval process was flawed because none of the detectives directing the recovery of the skeleton were experienced in the recovery of skeletal remains, as evidenced by the fact that the majority of the trauma inflicted on the remains was postmortem.
La.Code of Evid. art. 901(A), establishing the general law relative to authenticity, provides as follows:
The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
The purpose of the chain of custody rule is to prevent evidence from being tampered with or from being lost. State v. Swafford, 588 So.2d 1276, 1280 (La.App. 2d Cir.1991). However, the law does not require that the evidence as to custody eliminate all possibility that the object has been altered.
To properly identify evidence at trial, the identification can be visual or by chain of custody of the object. State v. Vampran, 491 So.2d 1356, 1365 (La.App. 1st Cir.), writ denied, 496 So.2d 347 (La.1986). Lack of positive identification or a defect in the chain of custody goes to the weight of the evidence *1224 rather than to its admissibility. State v. Francis, 597 So.2d 55, 60 (La.App. 1st Cir. 1992). Hence, a continuous chain of custody is not essential to enable the state to introduce physical evidence as long as the evidence as a whole establishes that it is more probable than not that the object introduced was the same as the object originally seized. State v. Myles, 616 So.2d 754, 758 (La.App. 1st Cir.), writ denied, 629 So.2d 369 (La. 1993). Ultimately, a chain of custody or connexity of the physical evidence is a factual matter for determination by the jury. State v. Spooner, 550 So.2d 1289, 1304 (La.App. 1st Cir.1989), writ denied, 566 So.2d 394 (La. 1990).
Defendant's claim that the recovery process was so flawed as to make authentication impossible is without merit. Initially, we note that, although the victim's remains bore traces of postmortem trauma, the discovery of the remains was accidental and after heavy machinery was used extensively in the area. Thus, it is likely that the postmortem trauma was not attributable to the state's recovery efforts. Moreover, Professor Mary H. Manhein of Louisiana State University, a forensic anthropologist who assisted in the investigation of the victim's cause of death, testified that the condition of the skeletal remains did not prevent her from rendering a reliable opinion.
Although defendant basically contends that the remains were not subject to positive identification because of the trauma they sustained during the recovery process, he does not claim that the state failed to prove that the remains introduced in court were not the objects recovered from his former yard. The victim's remains were uniquely susceptible to visual identification, and the possibility that they may have been confused with other human skeletal remains in the state's custody appears to be remote. Professor Manhein testified that the bones were sufficiently preserved so that positive identification and a conclusive cause of death could be established. Furthermore, Jerry Knight identified the victim's jawbone as being similar to the object he discovered in his yard.
Accordingly, defendant's assignment of error is without merit.

SUFFICIENCY OF THE EVIDENCE
Through assignment of error number twenty-six, defendant submits that the evidence was insufficient to support his conviction. Specifically, defendant argues that the state failed to exclude every reasonable hypothesis of innocence. Defendant contends that "[a] reasonable hypothesis could be made that Allen [Foret, Donna Foret's brother] paved the way for Donna's marriage to Dale by taking Connie's life."
When assessing the sufficiency of the evidence to support a conviction on appeal, the reviewing court is bound by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Accordingly, the measure is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2]Jackson, 443 U.S. at 319, 99 S.Ct. at 2789.
Additionally, the statutory rule as to circumstantial evidence provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. However, La.R.S. 15:438 is not to be construed as a test separate from the standard set in Jackson, supra. Rather, La.R.S. 15:438 articulates "an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt." State v. Augustine, 545 So.2d 1203, 1205 (La.App. 4th Cir.1989). Hence, no stricter standard is employed for the review of circumstantial evidence, being that "[d]ue process requires no greater burden." State *1225 v. Porretto, 468 So.2d 1142, 1146 (La.1985). Thus, all evidence, direct and circumstantial, must satisfy the Jackson standard.
In State v. Captville, 448 So.2d 676, 680 (La.1984), the supreme court set forth a test for reviewing the sufficiency of the evidence in light of a defendant's persistence of innocence and a conviction involving circumstantial evidence, as follows:
When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt. As we have recognized in such cases as State v. Wright, 445 So.2d 1198 (La.1984), State v. Graham, 422 So.2d 123 (La.1982), and State v. Sutton, 436 So.2d 471 (La.1983), the court does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not "have found proof of guilt beyond a reasonable doubt". Jackson v. Virginia, above.
Furthermore, the trier of fact may accept or reject, in whole or in part, the testimony of any witness. State v. Rogers, 494 So.2d 1251, 1254 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). Accordingly, the reviewing court's limited authority does not extend to credibility determinations. Rogers, 494 So.2d at 1254. Instead, the reviewing court is confined to the sufficiency of the evidence evaluation promulgated in Jackson. Rogers, 494 So.2d at 1254. Thus, the reviewing court will not assess the credibility of the witnesses or reweigh the evidence to overturn the factfinder's determination of guilt. State v. Matthews, 450 So.2d 644, 647 (La.1984).
As previously discussed, the victim's remains were found approximately eight years after her disappearance in the yard of the residence she shared with defendant. Although the recovery process caused some trauma to the bones, Dr. Alfredo Suarez, a forensic pathologist, testified that the cause of the victim's death was a severe linear fracture in the thickest part of her skull. From the physical characteristics of the fracture, he was able to determine that the skull was fractured before the victim's death.
John Lewoczko, a special agent for the Federal Bureau of Investigation, testified that clothing found with the victim's remains showed one or more holes that could have been caused by gunshot. When the victim's blouse was tested, traces of lead, consistent with gunshot, were found in the fabric. No lead was discovered in the victim's brassiere, which bore holes that matched with the punctures in the blouse. Although none of the victim's organs were available for examination, Dr. Suarez testified that if the victim was wearing the blouse, and assuming that one of the holes was caused by a firearm discharge, that gunshot could also have been "death provoking."
Professor Mary Manhein identified and illustrated several types of trauma evident from the victim's remains. First, was perimortem trauma, trauma inflicted at or near the victim's death. Second, was postmortem trauma, trauma inflicted after the victim's death. Professor Manhein noted that the postmortem trauma was possibly caused by the recovery process or shifting of the ground after the body was buried.
Perimortem trauma evident in the remains included: (1) A sharp, slice type break in the back of the skull, of such force that both the occipital bone and the inside table were broken, resulting in a hinge fracture; (2) trauma to an upper leg bone; (3) trauma to the left scapula (shoulder blade); (4) a broken index finger; (5) trauma to the first lumbar and twelfth thoracic vertebrates; and (6) several (5-8) broken ribs. Moreover, the hole in the blouse that was surrounded by fabric containing lead particles roughly corresponded with the damage to the lower back region. Professor Manhein further testified that the *1226 victim was under age twenty-five when she died because her third molar had not erupted. As stated above, the victim was twenty-three years old when she disappeared.
Donna Foret testified that she met defendant in March 1983, while they were both employed at a department store. Foret testified that their relationship was grounded in friendship. However, Foret stated that they eventually became intimate. Defendant told Foret that he had filed for divorce and that he was not living with his wife. Further, defendant told Foret that his wife intended to flee the state with an alleged boyfriend, leaving him the custody of their two daughters.
Approximately one week before the victim disappeared, defendant told Foret that he had given the victim $20,000.00 in cash and that she had left the state on a bus. However, her brother, Allen Foret, confronted defendant about his claim that the victim was no longer living at the residence. At the time of the confrontation, notwithstanding defendant's declaration that she had left the state, the victim answered the door. Defendant claimed that she was there simply to clean the house. Allen Foret brought his sister back to defendant's house to show her that Connie Gaudet was still living with defendant, but no one answered the door. Furthermore, Gay Foret, Allen's wife at the time of the confrontation, testified that she called the victim shortly thereafter and told her that defendant was having an affair with Donna Foret.
Mike Farrow, the victim's supervisor at the grocery store where she worked, testified that the victim began a new position as a cashier at the store on Saturday, February 18, 1984, the day of her disappearance. Farrow testified that the victim's new position was regarded as an improvement over her former responsibilities. The victim worked until 6:30 p.m. that Saturday. Defendant's mother, Bridgette Gaudet, kept the children while the victim worked. She testified that the victim picked up the children shortly after 6:30 p.m.
Donna Foret testified that defendant insisted that she come to his house around 9:00 p.m. on February 18. Foret stated that when she arrived, she found him acting in an unusual manner. She testified that defendant was shaky, skittish, biting his nails, nervous, and pacing. Furthermore, Foret testified that defendant was unable to speak in complete sentences. Additionally, as she walked through the house, Foret observed a saucer-sized, dark reddish-brown stain on the carpet next to a coffee table in the living room. When she inquired about the discoloration, defendant told her that the children had spilled Kool Aid on the carpet.
Defendant brought Foret back to a bedroom. He told her that the victim had left the night before. He claimed they had argued and he had gone to bed, leaving the victim to clean up the house, which had become disordered during the argument. Defendant stated that when he awakened, the victim was gone. When Foret asked him about his prior claim that the victim had left town with $20,000.00, defendant told her that she had returned.
While Foret was at the residence, defendant's mother called and told him that some cows in an adjacent pasture had been released. Foret looked out the window. She stated that she saw a car parked on the grass just outside. Defendant told her the car was leaking oil badly and that he did not want to stain the driveway.
Defendant called Foret Sunday evening to discuss how the children were taking their mother's disappearance. He mentioned that his father was pulling up the carpet. The following day, defendant asked her to look at some replacement carpet samples. By the time Foret had moved into defendant's house, the carpet had been changed. However, the new carpet was very similar to the carpet that had been in the house when defendant lived there with the victim. Additionally, several months after their marriage, Foret found the victim's clothing in one of the bedroom closets.
Gertrude Guidry testified that she worked with the victim at the grocery store. Defendant called her Sunday, February 19, 1984, at 6:00 a.m. and told her the victim was missing. Guidry testified that she did not socialize with the victim and did not understand *1227 why defendant called her, especially at that time of day.
Ethel Guidry, the victim's mother, testified that she last saw the victim approximately one week before the victim's disappearance. She spoke to defendant Sunday morning at approximately 9:00 a.m. Defendant told her that the victim had left the house the night before. He claimed that the victim called at 7:00 a.m. and awakened him. Defendant contended that the victim told him that she had left and that he was to take care of the girls. Additionally, Guidry did not recall seeing defendant's car at the house.
Approximately one week after the victim disappeared, her mother received a telephone call from a man who told her he had seen the victim with another man in a restaurant in Houma. When the victim's sister picked up a telephone extension, the caller hung up. Joe Watson, one of the defendant's co-workers, testified that he made that call at defendant's request. Watson stated that defendant asked him to call the victim's family, believing that he was concerned the family would seek custody of the girls after their mother's disappearance due to the manner in which she left.
Karen Landry, the victim's sister, testified that she went to defendant's house with her mother. While they were there, she saw the victim's car. However, she stated that she did not see defendant's automobile, a rust colored Camaro. Several days later, she went to the grocery store where defendant worked to talk to him about her sister's disappearance. She testified that she saw Donna Foret in his office. When Landry asked defendant about Foret's presence, he claimed that she was the victim's best friend and that she was concerned about the victim's disappearance.
The victim's family filed a report claiming she was missing. Although defendant claimed that he also had filed a report, no report other than the one filed by the victim's family was located. Defendant was questioned by the police. However, he gave a statement essentially confirming what he told the victim's mother.
The victim's younger daughter turned two years old a few days after her disappearance. Defendant's mother went by the house to deliver a birthday present. Bridgette Gaudet testified that she saw a freshly planted rose garden just outside the bedroom window. Furthermore, Julia Filce, the victim's best friend, testified that defendant's mother showed her a freshly planted rose garden on the Monday after the victim's disappearance.
Susan and Carol Louviere testified that they saw defendant digging in the garden, in dirt up to his knees, shortly after the victim's disappearance. The Louvieres cared for horses in a pasture behind defendant's house. The Louvieres stated that they observed defendant digging while they were exercising their horses. Additionally, Carol Louviere related the incident to the time of the victim's disappearance because he found it unusual that the defendant appeared to be keeping to his usual patterns of behavior despite his wife's very recent departure.
Julia Filce testified that the victim told her a man had shown interest in her but that she had rejected him. Filce identified jewelry found with the skeletal remains as the victim's engagement and wedding rings.
Julia Sapia, a neighbor, testified that she went to the victim's house a few days after her disappearance. At that time, defendant's mother commented to her that the victim had left in such a hurry she had not taken any of her clothing or her purse.
Gwen Porrier, the victim's sister, testified that defendant called her several weeks after her sister's disappearance and claimed that the victim had called him. Defendant told her that the victim had asked if she could send Easter presents to her daughters.
Although defendant told several persons that he had heard from the victim, only one person, Linda Rochel, testified that defendant claimed he actually had seen the victim. Defendant told her that the victim called him to come to her hotel room because she was having problems with her boyfriend.
Defendant filed for divorce from the victim. Defendant obtained a divorce. Further, defendant married Donna Foret in June 1985, more than one year after the date of *1228 the victim's disappearance. As previously stated, Foret resided with defendant in the home that he shared with the victim.
Defendant and Foret were avid gardeners. After they were married, they built a greenhouse near the bedroom window where a garden formerly had been planted. The greenhouse was constructed in August 1985. Interestingly, defendant selected the site where the greenhouse was located and poured the slab himself. However, Foret found the site defendant selected for the greenhouse inconvenient and ill-suited for its purpose. The slab on which the greenhouse was built was in the same area where defendant's car had been parked the night the victim disappeared and where the rose garden was planted a few days later. The slab was broken during the excavation for the sewer project, and the victim's remains were discovered buried beneath it.
Defendant testified on his own behalf. He claimed that he and the victim had been having marital difficulties for several months prior to her disappearance. He stated that about ten months before she disappeared, they began to occupy separate bedrooms. Approximately six months before the victim disappeared, defendant began a sexual relationship with Donna Foret. However, defendant claimed that they did not discuss marriage until after the victim left.
Furthermore, defendant denied that he had been working in the yard shortly after the victim's disappearance. He admitted that he had asked Joe Watson to make the telephone call to the victim's family. However, defendant claimed he had received a telephone call from a woman who told him that she had seen the victim at the Piccadilly Restaurant in Houma and he believed her family should have that information. Strangely, defendant was unable to explain why he had not notified the police about having received this telephone call in light of his testimony that he had reported her missing a few days earlier.
Moreover, defendant claimed that Donna Foret lied about having been to his house on February 18, 1984. Additionally, defendant contended Landry and Ethel Guidry were either lying or mistaken about their testimony that his car was not under the carport the following morning. Defendant also denied that he called Gertrude Guidry at 6:00 a.m.
Defendant claimed that the garden outside the front bedroom window contained vegetables, not roses, when the victim disappeared and that it was not freshly planted. Defendant denied that the Louvieres saw him digging in the yard shortly after the victim's disappearance. Defendant claimed that the greenhouse was built on what he believed to be the best location for that project, implicitly contending it was built over the victim's body by coincidence. Defendant specifically stated that he did not kill his wife and did not know how her body got buried in his former yard.
As indicated above, defendant did not sell the property until February 1991. During cross examination, defendant admitted that he was an avid gardener and regularly attended the yard so that he would have been aware if someone would have unearthed his plantings and dug a hole large enough to bury the victim's body. Yet, in light of expert testimony which concluded that the victim was murdered before she reached twenty-five years of age, meaning that the killing occurred no later than 1985, and the discovery of her remains beneath the slab he poured in 1985, defendant failed to explain the victim's burial in his former yard. Furthermore, defendant was unable to explain why the victim would have been wearing her wedding and engagement rings at the time of her death if she actually had left with another man.
In light of the above summarized testimony, the jurors obviously and reasonably concluded that defendant's explanation of his wife's sudden departure was designed to deflect blame from him. Defendant's testimony that he heard from her several times after her departure was discredited by other evidence. Under these circumstances, the jurors' conclusion that defendant was not testifying truthfully could reasonably support an inference that the "truth" would have been unfavorable to his defense.
Defendant's allegation that Allen Foret might have murdered the victim so that his sister could marry defendant is unsubstantiated *1229 and unreasonable. Defendant primarily contends that the state's witnesses were not credible or that the state's reconstruction of the offense was so bizarre as to be incredible. However, as we stated above, this court will not assess the credibility of witnesses or reweigh the evidence to overturn the jury's determination of guilt. Although the reconstruction of the events on which the prosecution was based is admittedly bizarre, the state's case was solidly based on both physical and circumstantial evidence. Thus, although the offense could be described as bizarre, its prosecution was not.
The jury's verdict reflected a reasonable construction of the events based upon the evidence viewed in the light most favorable to the prosecution. Evidence that the victim had been shot, as well as her mysterious burial in a residential area, clearly ruled out any theory of accidental death. Moreover, the jury rejected defendant's explanation that his wife voluntarily left and that he had no knowledge of why her body was found buried in his yard. Hence, because there does not appear to be any other hypothesis which raises a reasonable doubt as to defendant's guilt, we cannot say that a rational juror could not have voted to convict.
Accordingly, defendant's assignment of error is without merit.

NEW TRIAL
In his final assignment of error, defendant submits that several erroneous rulings made by the trial court during the proceedings entitle him to a new trial. Defendant incorporates by reference the issues previously discussed. Having found no merit in those assignments of error, we find no error in the denial of defendant's motion for a new trial raising the same claims.
Accordingly, defendant's assignment of error is without merit.

DECREE
For the reasons expressed above, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] The minute entry of the imposition of sentence does not reflect that the trial court waited twenty-four hours after the denial of defendant's motion for new trial before imposing sentence, nor was the statutorily required delay waived. See La.Code Crim.P. art. 873. However, defendant did not challenge the sentence. See State v. Augustine, 555 So.2d 1331, 1333-1334 (La.1990). Accordingly, any error in failing to observe the delay was harmless.
[2] This standard was adopted by the legislature through the enactment of La.Code Crim.P. art. 821, which pertains to motions for post verdict judgments of acquittal based on insufficiency of evidence. The Official Revision Comment to La. Code Crim.P. art. 821 illustrates the legislature's intent to adopt the Jackson standard for both trial and appellate court review of the evidence for reasonable doubt.