802 So.2d 914 (2001)
STATE of Louisiana
v.
Kristen GOMEZ.
No. 01-KA-717.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2001.
*915 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison Wallis, Assistant District Attorneys, Gretna, LA, Counsel for, State of Louisiana, Plaintiff-Appellee.
Donald L. Hyatt, II, Donald L. Hyatt, II, APLC, New Orleans, LA, Counsel for, Kristen M. Gomez, Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
ROTHSCHILD, Judge.
On November 21, 2000, the Jefferson Parish District Attorney filed a three-count bill of information charging the defendant, Kristen Gomez, and co-defendant, David Hernandez, with possession with intent to distribute MDMA (ecstacy) (count one), GHB (count two), and testosterone (count three), violations of LSA-R.S. 40:966(A), LSA 40:967(A), and LSA-R.S. 40:968(A), respectively.[1] Gomez pled not guilty at arraignment, but subsequently pled guilty as charged to counts one and three, reserving his right to appeal the denial of his motion to suppress pursuant *916 to State v. Crosby, 338 So.2d 584 (La. 1976).[2]
On March 15, 2001, the trial judge sentenced the defendant to five years of imprisonment at hard labor on counts one and three to be served concurrently. The court suspended execution of the sentences and placed the defendant on three years of active probation. As a condition of probation, the court ordered the defendant to serve 18 months in parish prison. The court further ordered the defendant to pay a $100 Commissioner's fee, a $300 fine, all court costs, and the monthly probation supervision fee. The defendant filed a timely motion for appeal, which the trial judge granted.

FACTS
The defendant, Kristen Gomez, sought to suppress evidence seized from his room on October 6, 2000 after his roommate, David Hernandez, consented to a search of the house. The events leading up to the seizure of the evidence were set out at the suppression hearing.
Narcotics Agent John Pacaccio of the Jefferson Parish Sheriffs Office testified that another officer, Artie Thompson, of the Tri Parish Task Force in Hammond, received information from a confidential informant about a drug purchase in Jefferson Parish or New Orleans. Agent Thompson told Agent Pacaccio that his informant advised him that two people, Brett Batori and Stephanie Schaffer, would be coming from the Covington/Hammond area to the New Orleans area to purchase some "ecstacy."
After Agent Thompson described the vehicle, a green pick-up truck, Agent Pacaccio and his officers set up surveillance on Interstate 10 eastbound at the Loyola Avenue exit. When Jefferson Parish officers spotted the vehicle at the Loyola exit, Agent Pacaccio followed the vehicle until it stopped at a gas station at Terry Parkway and Holmes Boulevard on the westbank of Jefferson Parish.
The driver, Brett Batori, purchased gas and then met up with another man, later identified as Kristen Gomez. The vehicles left the gas station, with Gomez in the lead. The officers continued surveillance until Gomez and Batori arrived at a house located at 308 Cherry Blossom Lane in Terrytown. Agent Pacaccio and his partner, Agent Lynch, parked a few houses away, and observed all three of the occupants enter the Cherry Blossom residence. Five to ten minutes later, the three exited the house accompanied by another man, later identified as David Hernandez. Batori and Schaffer left in the green truck, while Hernandez and Gomez returned inside.
Agent Pacaccio dispatched two units to follow the green truck, and he and Agent Lynch maintained surveillance on the house. The officers followed the truck to the Oakwood Mall, where they parked and went into the mall. Agent Pacaccio directed one unit to trail Batori and Schaffer, and the other unit to remain with the truck. Meanwhile, Agent Pacaccio asked Agent Thompson to contact the confidential informant to discover whether the drugs were picked up. A short while later, Agent Thompson informed him that the informant said that Batori had the ecstacy.
Shortly thereafter, all of the participants were in motion. First, Gomez drove to Rite Aid, but returned shortly thereafter *917 to 308 Cherry Blossom. Then, he left a second time, and other officers followed. Hernandez left the residence in his vehicle, with Agents Pacaccio and Lynch following. Next, the officers surveilling Batori and Schaffer followed them as they drove to 308 Cherry Blossom. At this point, Agent Pacaccio stopped Hernandez, and ordered the other units to stop Batori and Gomez, and to advise them of their constitutional rights.
Agent Pacaccio testified that he informed Hernandez of the on-going investigation, and advised him of his constitutional rights. According to Agent Pacaccio, Hernandez signed the waiver of rights form and stated that he had "no knowledge of any ecstacy sale going on that it has to be his roommate." After Hernandez consented, the officers searched his vehicle to no avail. Agent Pacaccio stated that he then told Hernandez that he would like Hernandez to consent to a search of 308 Cherry Blossom and that he was "three quarters of the way through a search warrant." Thereafter, Hernandez signed the consent form. According to Agent Pacaccio, Hernandez told him that the residence was his father's and that Gomez was not paying rent for occupying the residence.
Agent Pacaccio instructed officers to return to 308 Cherry Blossom with Gomez, Batori and Schaffer. When Agent Pacaccio returned to the house with Hernandez, Hernandez told him that his girlfriend was inside the house and was very ill. After Agent Pacaccio knocked on the door, the girlfriend answered the door, and Hernandez and the officers entered. Hernandez and his girlfriend sat at the kitchen table while officers conducted a search of the residence "to make sure nobody else was hiding" in the house. When Agent Pacaccio entered the first bedroom, which belonged to Gomez, the officer saw a white pill on the floor in front of the bed. According to Agent Pacaccio, the pill field-tested positive for the presence of MDMA (ecstacy). Agent Pacaccio said that after spotting the pill, he brought Hernandez into the bedroom and pointed at the pill. According to Agent Pacaccio, Hernandez said, "[t]hat's ecstacy. Everybody knows what ecstacy looks like."
Thereafter, the officers recovered more ecstacy, several vials of steroids and cash from one of the closets in Gomez's room. Agent Pacaccio stated that syringes "used for the steroids" were found in the room in a box next to the bed. Officers seized additional steroids in Hernandez's bedroom. While searching the kitchen, officers found a gallon container of GHB in the refrigerator. Some materials to make GHB were also discovered in the kitchen.
Kristen Gomez also testified at the hearing. Gomez said he had been living at 308 Cherry Blossom, which is a double, for one month and had paid $250 in cash as rent. He stated that he was staying with Hernandez on one side of the house, until work on the other side was complete. Gomez claimed he planned to rent the other side of the house, and he said had already paid his deposit, $350.00 plus $550 in rent. According to Gomez, Hernandez did not provide a receipt for the money, but used the money to purchase materials for the work performed on the other side. Gomez said Hernandez might have receipts for those materials. The defense called another witness, Michael Oddo, who testified that he used to rent the bedroom that Gomez then occupied.

DISCUSSION
On appeal, the defendant asserts that the trial court erred in denying his motion to suppress the evidence gained as result of a search of his bedroom when there was no warrant, he did not consent to the search, and exigent circumstances have *918 neither been alleged nor proven. The defendant contends that the trial judge should have suppressed the evidence seized from his bedroom because it was the product of an illegal search. In essence, the defendant argues that Hernandez could not waive Gomez's privacy interest in the bedroom that he occupied. To the contrary, the State asserts that the trial court "had factual support that either the defendant did not live in the house or that the police had a reasonable belief that he did not."
The Fourth Amendment to the United States Constitution and Article I, § 5 of the 1974 Louisiana Constitution prohibit unreasonable searches and seizures. A search made without a warrant issued upon probable cause is unreasonable unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). A consent to search by a third person is such an exception when it is freely and voluntarily given by a person who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, 901, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999).
The first issue presented in this case is whether Hernandez possessed common authority over the bedroom in which Gomez slept.[3] In order for the search to be valid, Hernandez had to possess common authority over Gomez's bedroom or the police had to reasonably believe that he had common authority sufficient to justify the warrantless search and seizure.
In Matlock, supra, the Supreme Court discussed the issue of common authority and noted that it does not automatically flow from the third party's property interest in the searched area:
Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the thirdparty consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
Matlock, 94 S.Ct. at 993, n. 7.
Consistent with Matlock, Louisiana courts have looked to the facts of the particular case in determining whether a *919 person has a reasonable expectation of privacy in another person's home. In State v. Cover, 450 So.2d 741 (La.App. 5 Cir.1984), writ denied, 456 So.2d 166 (La.1984), the defendant was staying with a woman, Ms. Chaisson, who consented to a search of her apartment. Ms. Chaisson told police that she kept some marijuana in her dresser drawer for "personal use." When police entered the apartment, they found the defendant in the master bedroom standing next to an open bag containing narcotics. The defendant sought to suppress the narcotics on the basis that Ms. Chaisson could not waive his privacy interest in the master bedroom, a reason similar to that advanced by Gomez in this case.
Before ultimately rejecting this argument, the Cover court discussed the law on third-party consent and its exceptions as follows:
An exception to this general rule occurs when there are within a residence areas or zones for the exclusive use of one tenant or the other. In such a situation, there is no "common authority" which would justify a search based on consent from the non-occupying party. This premise is true in a host/guest relationshipi.e., the host could not consent to a search of a room set aside exclusively for the use of a guest.
A second exception in the host/guest context would be articles or belongings which would be most commonly deserving of the "high expectation of privacy" label. Illustrative of this exception is United States v. Poole, 307 F.Supp. 1185 (E.D.La.1969). In that case, police searched Poole's closed overnight bag, which had been left in a friend's hall closet, upon receiving the consent of Poole's host. The court concluded,
"The rule which emerges is that a defendant may object to a search consented to by another where the defendant has exclusive control over a part of the premises searched or over an `effect' on the premises which is itself capable of being (and is) `searched.' `Enclosed spaces' over which a non-consenting party has a right to exclude others, whether rooms or effects, are protected. * * *" 307 F.Supp. at 1189.
State v. Cover, 450 So.2d at 746.
The court concluded that case did not present any circumstances to warrant invoking the above exception for two reasons. The master bedroom was not set aside for defendant's exclusive use, since Ms. Chaisson's possessions were still there, and the defendant's bag was not closed "against visual intrusion." Id.
The court applied a similar analysis in State v. Melbert, 94-140 (La.App. 3 Cir. 11/30/94), 649 So.2d 740. In that case, the defendant occupied a room, rent-free, in the home of his girlfriend's parents. The police had information that the defendant was trafficking in cocaine and possessed a large amount of it at the residence. Officers obtained consent to search the home from the girlfriend's mother, who identified the rooms of the home. Inside the guest room, the police found some crack cocaine in a zippered bag at the foot of the bed. They also located more drugs, stolen watches, and $800.00 in cash in socks stuffed in a dresser drawer. Id. at 742.
In concluding that the defendant did not have a reasonable expectation of privacy in the room, the court observed that the defendant did not pay rent, that everyone in the home had access to the room since it did not have a lock, that he had no key to the house, and that many of the family's personal items were stored in the closet and dresser drawers in the room. Because the defendant had no implicit or explicit right to exclude anyone else from the room, the court held that his girlfriend's *920 mother could validly consent to a search of the entire home, including his room. Id. at 743.
However, the court recognized that she could not validly consent to a search of the defendant's zippered bag as follows:
In this case, even as a guest MELBERT reasonably had a high expectation of privacy in his personal effects in that room. While MELBERT did not have exclusive control over access to the room in which he was living, we find that he had every right to expect privacy over his personal effects in that room even from the owners of the home, and particularly, against intruding law enforcement officers. Under the facts of this case, we hold that a guest in the home of another who has the use of a room, albeit with limited privacy, can expect that his personal belongings in luggage, a purse, or even a boot bag, and other similar items will not be searched or rummaged through without his permission.
Id. at 743 (emphasis in the original).
In State v. Charles, 602 So.2d 15 (La. App. 3 Cir.1992), writ denied in part, granted in part on other grounds, 607 So.2d 566 (La.1992), the court held that the defendant, a murder suspect, had no reasonable expectation of privacy in his suitcase, which he left in the den of his cousin's house where he was visiting. While the defendant was away, the defendant's cousin, Norris Charles as well as Norris' wife, consented to a search of the suitcase. The court concluded that the search was constitutional because the defendant had no legitimate expectation of privacy in the suitcase left out in the open in the den, and because the officers were reasonable in relying on the Charles' consent to search the home and suitcase. The court looked to several factors, including the fact that the den was used by all of the family and was not set aside for the defendant's exclusive use. Further, the defendant's expectation of privacy in the suitcase was lessened by his actions, since he showed his cousin the contents of his suitcase (the gun that he sought to suppress). Id. at 18-19
In the present case, the trial court concluded that the warrantless search was valid because the officers "felt secure in the fact that the residence was the residence of Mr. Hernandez, not of Mr. Gomez." This was apparently based on Agent Pacaccio's testimony that indicated he concluded Hernandez had the authority to consent to a search of Gomez's room because Gomez did not pay rent. However, the foregoing cases illustrates that the validity of a third party's consent turns on the existence of common authority, not solely on whether a person pays rent.
In this case, it does not appear the State established the fact that Hernandez had common authority in the bedroom that Gomez occupied. The only evidence suggestive of common authority is Agent Pacaccio's testimony that the door to Gomez's bedroom was open. There is no indication as to whether Hernandez kept personal belongings in that room or whether he frequented the room. This situation is different from Cover, in which the other occupant of a jointly inhabited bedroom consented to a search. It is also different from Charles, in which defendant kept his personal belongings in the den, an area of the home used by everyone. Accordingly, it does not appear that the State met its burden to show that Hernandez validly consented to a search of Gomez's room.
However, the issue of Hernandez's consent is not the end of the inquiry. In Illinois v. Rodriguez, 497 U.S. 177, 185-189, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the United States Supreme *921 Court held that a warrantless entry and search may be valid even if the person who consented did not have common authority over the premises, so long as the police reasonably believed that the person possessed common authority over the premises. In that case, Gail Fischer reported that the defendant had assaulted her earlier that day. She then went to the defendant's apartment with the police and unlocked the door with a key. Upon entering, the police saw drug paraphernalia and what appeared to be powder cocaine. They arrested the defendant, who was in the bedroom sleeping. However, since it was later revealed that Ms. Fischer had moved out some months before the warrantless entry, the Court held that the State failed to meet its burden of proving that Ms. Fischer had common authority over the premises. Nonetheless, the Court recognized that if officers reasonably believed Ms. Fischer lived there, the warrantless entry would be valid, even though she did not actually possess common authority over the apartment.[4]
In the present case, the State asserts that the police were reasonable in believing Gomez did not live in the house. The State supports this assertion as follows: "In this case, through careful questioning of the legal occupant of the house ... the police confirmed that Gomez did not live in the house." This assertion is not supported by the record. Several times in his testimony at the suppression hearing, Agent Pacaccio acknowledged that he knew Gomez lived in the house. When Agent Pacaccio told Hernandez he was under investigation, Hernandez told the officer it must be "his roommate." The agent admitted on cross-examination that he believed Gomez was sleeping in that bedroom. Further, Agent Pacaccio stated that he knew that "[j]ust because Mr. Hernandez owns the residence doesn't give him the right for me to search his room. So, I wanted to make it clear that no rent, no money, no compensation was being given from Mr. Gomez to Mr. Hernandez."
However, as stated above, even if Agent Pacaccio believed Gomez did not pay rent for the room, that is not the legal test of whether Hernandez could consent to a search of the room Gomez occupied. In addition, there is very little in the record to indicate that Agent Pacaccio's belief that Hernandez had authority to consent to a search of Gomez's room was reasonable. The agent's own testimony indicates he knew Gomez stayed there.
The record before us is inadequate to determine whether Hernandez had common authority over the room in which Gomez slept. Furthermore, it appears that the trial court misapplied the standard of determining the validity of Hernandez's consent because the court concluded the officers "felt secure in the fact that the residence was the residence of Mr. Hernandez, not of Mr. Gomez." As illustrated by the previously discussed cases, the test is whether Hernandez had common authority over the bedroom where Gomez slept, or whether the facts known to the police supported a reasonable belief that Hernandez had such authority.
The Louisiana Supreme Court has remanded a case for a retrial of the motion to suppress to allow the State to attempt to meet its burden under the Fourth Amendment. See State v. Landry, 98-188 (La.1/20/99), 729 So.2d 1019, 1021, and the cases cited therein. In Landry, the Louisiana Supreme Court remanded for a retrial of the motion to suppress to allow the *922 State to meet its burden of showing probable cause because the trial court had applied the wrong standard in granting the motion to suppress. Id. Therefore, in accordance with the ruling in Landry, we remand for a retrial of the suppression hearing at which the evidence is to be judged by whether Hernandez possessed the requisite common authority over the bedroom or whether there were sufficient facts known to the police so that it would be reasonable for them to believe Hernandez possessed common authority over the bedroom. Factors indicating common authority would be similar to those in State v. Melbert, supra.
Accordingly, we vacate the judgment of the trial court denying the defendant's motion to suppress, and we remand to the trial court for further proceedings consistent with this opinion.
JUDGMENT VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] The district attorney declared count two to be nolle prosequi when Mr. Gomez pled guilty to counts one and three on March 8, 2001.
[2] On March 8, 2001, the parties inadvertently referred to count three as possession of testosterone, instead of possession with intent to distribute testosterone. On March 15, 2001, before the defendant was sentenced, the waiver of rights form was amended and the defendant pled guilty to possession with intent to distribute testosterone.
[3] The trial judge's conclusions indicate that he believed Agent Pacaccio's testimony that Hernandez said Gomez did not pay rent, rather than Gomez's testimony that he did pay rent. When the trial court is presented with conflicting testimony, the credibility of the witnesses is a matter within the sound discretion of the trier of fact and will not be disturbed on review unless clearly contradictory to the evidence. State v. Williams, 98-1006 (La.App. 5 Cir. 3/30/99), 735 So.2d 62, 73, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118. Accordingly, Gomez is viewed as a guest in Hernandez's home who was not paying rent.
[4] The Court did not actually conclude the warrantless entry and seizure was valid, but remanded to the lower court to make that finding, in light of the precepts announced in the opinion. Illinois v. Rodriguez, 497 U.S. at 189, 110 S.Ct. 2801.