STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-0020


STATE OF LOUISIANA

VERSUS

KENRY JAMES LEWIS

************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 92835,
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Jimmie C. Peters, Michael G. Sullivan, and John B. Scofield,[*] Judges.

**AFFIRMED.**

**Michael Harson, District Attorney**
**Keith A. Stutes, Asst. District Attorney**
**Post Office Box 3306**
**Lafayette, LA 70502**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**G. Paul Marx**
**Louisiana Appellate Project**
**Post Office Box 82389**
**Lafayette, LA 70598**
**(337) 237-2537**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Kenry James Lewis**

---

[*]John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as judge pro tempore.

PETERS, J.

The defendant, Kenry James Lewis, pled guilty to first degree murder, a violation of La.R.S. 14:30. However, in doing so, he reserved his right pursuant to *State v. Crosby*, 338 So.2d 584 (La.1976), to appeal the trial court rulings on pretrial motions. After the trial court sentenced the defendant, he appealed his conviction, asserting that the trial court erred in refusing to grant his motion to suppress certain items of clothing. For the following reasons, we affirm the conviction in all respects.

The State of Louisiana (state) and the defendant reduced to writing the factual basis for the plea. With regard to the offense itself, the document stated the following:

> On September 27, 2001, at approximately 11:20 PM, the defendant, using his cell phone, called and placed an order with the Domino['s] Pizza located on the Evangeline Thruway, in Broussard, LA. The defendant ordered the delivery of pizza to the location of 609 Austin Road, Youngsville, LA. At approximately 11:48 PM, a call was made from Domino's Pizza to the defendant's cell phone to confirm the order and delivery. At approximately 11:50 PM, the victim, Tiffany Ann Ulmer, left the Domino's Pizza in her car, marked with a Domino's Pizza sign, to make the delivery of the pizza ordered by the defendant to the location designated by the defendant, 609 Austin Road, Youngsville, LA.
>
> At approximately midnight September 27-28, 2003, Tiffany Ulmer arrived in the driveway at 609 Austin Road, Youngsville, LA, where the defendant was awaiting. A violent encounter ensued between the defendant and the victim, causing the defendant to drop the cell phone he had used to place the order; the defendant dropped his cell phone in the driveway. The defendant's cell phone was found by the police upon investigating the disappearance of the victim.
>
> During this violent encounter, the victim resisted and inflicted an injury to the defendant's eye. During this violent encounter, the defendant pulled hair from its roots from the victim's head. During this violent encounter, the defendant took physical control of the victim and of her car. The defendant forcibly seized the victim and carried her utilizing her car from that driveway at 609 Austin Road, Youngsville, La. to an area to the rear of 609 Austin Road, Youngsville, LA. Thereafter, the defendant physically injured and sexually abused the victim. The victim's face and skull were fractured. The victim's shoulder and ribs were broken.
>
> The victim resisted to the utmost but was overcome by the force of the attack by the defendant. The defendant then drove the victim's car, with the victim incapacitated, out of the area of the rear of 609 Austin Road. A short distance away, the defendant discarded the

Domino's Pizza sign from the top of the victim's car. The police found the discarded sign on the side of the road upon investigating the disappearance of the victim. The defendant carried to [sic] the dead or dying victim to a remote location in the middle of a sugar cane field where the defendant buried the body of the victim. The victim was killed when the defendant had specific intent to kill or to inflict great bodily harm and was engaged in second degree kidnapping, aggravated rape, or forcible rape.

Strands of the pulled hair of the victim were found in the pockets of the defendant. DNA from the roots of the pulled hair found in the pockets of the defendant were matched to DNA from the victim. A tooth from the remains of the victim were [sic] also matched to DNA from the victim.

After leaving the victim buried in a remote sugar cane field, the defendant drove the victim's car to another remote location and set fire to it. The defendant then walked to a friend's home nearby and obtained a ride from that friend back to 609 Austin Road, Youngsville, LA. When they arrived there and saw the police who had arrived to search for the missing victim, the defendant instructed his friend not to tell the police that he had seen the defendant.

Later, the defendant returned to the site of the victim's body and set fire to the remains. After the remains had been burned, the defendant covered the remains with debris from the sugar cane field. On or about December 4, 2001, the victim's remains were discovered. Her identity was confirmed by dental records and a comparison of DNA.

The clothing containing the victim's hair was seized by law enforcement officers in the search of an old house located on the 609 Austin Road property. The defendant attempted to have this evidence suppressed in a pretrial motion which the trial court rejected.

There exists little factual dispute surrounding the search and seizure of the clothing. Eddie Lewis, Sr., the defendant's father, owns the immovable property described as 609 Austin Road. His residence faces the street in front of the property and is connected to the street by a concrete driveway. Mr. Lewis' land contains other out-buildings, including an old house located on the rear of the property, where Mr. Lewis allowed a Mexican farm worker named Mendez to live rent free.

Deputy Keith Thomas Reed[1] arrived at Mr. Lewis' residence to investigate Tiffany Ulmer's disappearance at approximately 2:00 a.m. on September 28. He immediately found a pack of cigarettes and a cellular telephone with the battery detached, laying on the driveway in such a way as to suggest to the deputy that a struggle had ensued at that location in the immediate past. When he reattached the battery to the cellular telephone, the defendant's name and the cellular telephone number immediately appeared on the display screen. Deputy Reed then confirmed with other investigating officers that this cellular telephone had been used to make the Domino's Pizza order, resulting in Ms. Ulmer leaving to deliver a pizza to the Austin Road address.

Deputy Kyle Ipson arrived at the Austin Road address at approximately the same time as Deputy Reed. After obtaining additional information concerning the victim, Deputy Ipson began checking the area in an attempt to locate the victim's missing vehicle. During his search of the area, he recovered a Domino's Pizza sign, which had been attached to the victim's vehicle when she left for the delivery. The sign had been discovered in Vermilion Parish, approximately one to one and one-half miles from the Austin Road address. He then returned to the Austin Road address, where he and Deputy Reed remained until they were joined, at approximately 7:00 a.m., by Detectives John Babin and Terence Olivier.

When Detective Babin arrived, he encountered a farm hand who informed him that the old house behind the principal residence was occupied by "someone." Hoping that they might find the victim, or information about her, Detectives Babin and Olivier, together with Deputies Reed and Ipson, proceeded to the back of the property.

---

[1]All of the law enforcement officers identified in this opinion were employees of the Lafayette Parish Sheriff's Office.

3

They found the front door of the old house open, and after announcing their presence and receiving no response, the officers entered the house.

The officers quickly found the defendant asleep on a bed in a back room. After waking him, the officers patted him down for weapons, and Deputy Ipson obtained permission from the defendant to check the immediate area for weapons. Deputy Ipson then checked the bed where the defendant had been sleeping. In doing so, he lifted the upper mattress and observed the clothing, which would later be the subject of the seizure, lying between the mattresses. Because he was looking for weapons, Deputy Ipson did not secure the clothing at that time.

When questioned by Detective Babin about his presence in the house, the defendant told the detective that he did not live there and that his father allowed a Mexican farm hand to live in the house. Concerning the cellular telephone, the defendant informed Detective Babin that he had dropped it on his father's driveway the night before. At this point, Detective Babin advised the defendant of his *Miranda* rights and asked him to accompany the officers to the sheriff's office for further questioning. Detective Babin did not place the defendant under arrest at this time. At this point, the officers escorted the defendant outside of the house, and Deputy Reed transported him to the sheriff's office.

Detective Babin then spoke to Eddie Lewis, Sr., who told the detective that his son did not live in the old house, was not supposed to be there, and that he allowed Mr. Mendez to live there rent free. At the request of Detective Babin, Mr. Lewis gave written permission to search the old house. This occurred at approximately 8:10 a.m. Detective Babin also contacted Mr. Mendez and obtained his permission to search the house as well. The officers then reentered the old house and seized the clothing that Deputy Ipson had previously seen under the mattress.

4

In his sole assignment of error, the defendant asserts that the law enforcement officers, initially, did not have probable cause to enter the residence and question him and that the consent to search granted by his father and Mr. Mendez was not valid as to him.

> When a trial court rules on a defendant's motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress. The appellate court should not overturn a trial court's ruling, unless the trial court's conclusions are not supported by the evidence, or there exists an internal inconsistency in the testimony of the witnesses, or there was a palpable or obvious abuse of discretion. *State v. Burkhalter*, 428 So.2d 449 (La.1983) and *State v. Gaspard*, 96-1279 (La.App. 3 Cir. 2/11/98); 709 So.2d 213.

*State v. Bargeman*, 98-617, p. 5 (La.App. 3 Cir. 10/28/98), 721 So.2d 964, 967, *writ denied*, 99-33 (La. 5/28/99), 743 So.2d 658.

The right to be protected from unreasonable searches and seizures at the hands of law enforcement officers is protected by both the federal and state constitutions. U.S. Const. art. IV; La. Const. art. I, § 5. With regard to warrantless searches, the supreme court has held in *State v. Brisban*, 00-3437, p. 4 (La. 2/26/02), 809 So.2d 923, 927:

> Warrantless entries into the home for arrest or seizure are invalid in the absence of exigent circumstances. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment has drawn a firm line at the entrance to the home, and a police officer therefore needs both probable cause to arrest or search and exigent circumstances to justify a non-consensual warrantless intrusion into a private premises. *State v. Talbert*, 449 So.2d 446 (La.1984); *State v. Hathaway*, 411 So.2d 1074 (La.1982).

Exigent circumstances include situations where: law enforcement officers have reasonable grounds to protect the lives of others, the entry and search is not motivated by an intent to arrest someone or to seize evidence, and there is a reasonable basis to associate an emergency with the area to be entered and searched. *State v. Kirk*, 00-190 (La.App. 4 Cir. 11/13/02), 833 So.2d 418, *writ denied* 02-3079 (La. 5/9/03), 843

5

So.2d 394, (citing *Roska v. Peterson*, 304 F.3d 982 (10th Cir. 2002), *abrogated in part on other grounds*, 328 F.3d 1230 (10th Cir. 2003)). As stated in *Kirk*, "The United States Supreme Court has defined exigent circumstances as 'a plausible claim of specially pressing or urgent law enforcement need.' *See Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001)." *Id.* at 420.

In rejecting the defendant's motion to suppress, the trial court obviously concluded that both probable cause and exigent circumstances existed for the initial entry into the older structure, which resulted in the discovery of the defendant asleep in the bedroom. We agree with the trial court's conclusion.

Given all of the information known to the investigating officers on the morning of September 28, 2001, it is clear that they had reasonable grounds to believe that there was an immediate need to protect the life of Tiffany Ulmer, if at all possible. She had been missing since 11:50 p.m. the day before, and all of the evidence available to the officers on the morning of September 28 pointed to foul play. Certainly, time was of the essence in the investigation. Both Deputy Ipson and Detective Babin stressed that their entrance into the house, where the defendant was sleeping, was motivated by their desire to obtain information concerning the missing victim and not to make an arrest or to seize evidence. Given the surrounding circumstances, and especially the information given to Detective Babin that "someone" was in the old house, the officers had a reasonable basis, if not probable cause, to associate an emergency situation with the occupied house. When Deputy Reed first arrived at 609 Austin Street, the last place the victim was supposed to have been, he found signs of a struggle and the defendant's cellular telephone. Thus, we conclude that the investigating officer had sufficient extigent circumstances and

6

probable cause to enter any buildings at 609 Austin Street for the purpose of attempting to locate the victim.

The defendant also argues that the clothing had already been seized before the officers gained the consent of Mr. Lewis and Mr. Mendez. This argument is based on the conflicting testimony of Detective Babin and Detective Olivier. While Detective Babin testified that the clothing had not been removed from under the mattress until he gained permission from Mr. Lewis and Mr. Mendez, Detective Olivier testified that the clothing had been removed from under the mattress and placed on top of the bed, where it remained until consent was obtained from both men. Even assuming Detective Olivier's recollection of the events of the seizure to be accurate, the movement from under the mattress to the top of the mattress would have no effect on the seizure.

"A seizure occurs when 'there is some meaningful interference with an individual's possessory interests' in the property seized." *Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782 (1985), (citing *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656 (1984)). In this case, the officers did not remove the clothing from the premises until Detective Babin obtained the consent of Mr. Lewis and Mr. Mendenz. By that time, the defendant had been transported to the sheriff's office. Thus, there could be no interference with his actual possession because he did not have actual possession. Additionally, because, at most, the evidence shifted only location with regard to the mattress and never actually left the premises, there was no interference with the defendant's constructive possession of the clothing prior to the officers receiving consent to search.

7

The defendant also asserts that the consent from Mr. Lewis and Mr Mendez was not sufficient to search a room where he was found. With regard to warrantless searches with consent, the supreme court has held:

> It is well settled that a warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and United States Constitutions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Dowling*, 387 So.2d 1165 (La.1980); *State v. Wilkerson*, 367 So.2d 319 (La.1979); *State v. Wagster*, 361 So.2d 849 (La.1978); *State v. Mitchell*, 360 So.2d 189 (La.1978). Consent is valid when it is freely and voluntarily given by a person who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). This common authority stems not so much from one's property interest, ". . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of the number might permit the common area to be searched." *Matlock, supra,* 94 S.Ct. at 993, fn. 7.

*State v. Bodley*, 394 So.2d 584, 588 (La.1981).

Mr. Mendez testified that the defendant would shower and spend the night in his house on occasion. Additionally, the defendant left work uniforms in the house at times. The bedroom where the defendant would stay had no lock, and Mr. Mendez had full access. Thus, there was no area of privacy given to the defendant in Mr. Mendez's house, and he stayed at the sole discretion of Mr. Mendez. Thus, we find that Mr. Mendez could give his consent to search the entire house. *See State v. Gomez*, 01-717 (La.App. 5 Cir. 11/27/01), 802 So.2d 914; *State v. Melbert*, 94-140 (La.App. 3 Cir. 11/30/94), 649 So.2d 740; *State v. Evins*, 626 So.2d 480 (La.App. 3 Cir. 1993).

## DISPOSITION

We affirm the defendant's conviction in all respects.

**AFFIRMED.**